TOBER et al., Appellants,

v.

KAISER FOUNDATION HOSPITALS et al., Appellees.*

[Cite as *Tober v. Kaiser Found. Hosp.* (1992), 79 Ohio App.3d 333.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 59730.

Decided March 30, 1992.

---

* Reporter's Note: A motion to certify the record to the Supreme Court of Ohio was overruled in (1992), 64 Ohio St.3d 1444, 596 N.E.2d 473.

*Mark F. Kruse* and *Patrick J. Gallagher,* for appellants.

*Beverly A. Harris,* for appellees Kaiser Foundation Hospitals, Dr. Juan A. Toledo, Dr. Fernando Aymat, Dr. Abi Afonja and Dr. Nicholas M. Sekerak.

*Steven J. Hupp,* for appellee Dr. Edward W. Shannon.

FRANCIS E. SWEENEY, Judge.

Plaintiffs-appellants, Paul E. Tober and his wife, Jeanette K. Tober, appeal from the judgment of the common pleas court which rendered summary judgment in favor of defendants-appellees, Kaiser Foundation Hospitals, Dr. Abi Afonja, Dr. Fernando Aymat, Dr. Edward W. Shannon, and Dr. Nicholas M. Sekerak. For the reasons that follow, we reverse the judgment of the common pleas court.

Appellants commenced this action on February 5, 1987, alleging the appellees were negligent in misdiagnosing appellant Paul E. Tober's condition as multiple sclerosis, when, in fact, appellant suffered from cervical myelopathy, a surgically correctable spinal disorder. Appellees Kaiser Foundation Hospitals, Dr. Aymat, Dr. Afonja and Dr. Sekerak jointly moved for summary judgment. Drs. Shannon and Juan A. Toledo thereafter separately moved for summary judgment, Dr. Shannon fully incorporating the previous defendants' motions. Appellants also moved for partial summary judgment. All motions were based on the issue of whether appellants' complaint was time barred pursuant to R.C. 2305.11.

The evidence indicates that beginning in February 1977, appellant was examined by Dr. Shannon, who diagnosed him as having multiple sclerosis.

Appellant was subsequently treated by a number of physicians, all of whom are or were affiliated with Kaiser Foundation Hospitals. Appellant states all of the defendants/physicians either confirmed the diagnosis of multiple sclerosis or were silent to said diagnosis.

When appellant's condition did not improve, the physicians at Kaiser apparently referred appellant to University Hospitals of Cleveland for a neurologi-

cal consultation. Appellant avers that on September 4, 1985, he visited Dr. Selman of University Hospitals, who advised appellant he may have bony spurs on his neck. Appellant's deposition testimony indicates he was advised he needed surgery to remove these spurs, but appellant did not want to have surgery until the first of the year. However, appellant's affidavit states Dr. Selman suggested "the possibility of surgery but recommended another 'MRI' (magnetic resonance imaging) test." In any event, it was appellant's understanding that Dr. Selman did not feel surgery was urgent.

Appellant underwent an MRI test on September 16, 1985. Thereafter, sometime during the first week of January 1986, appellant was told by Dr. Selman that he needed to undergo a myelogram test, which was given to him on January 6, 1986. Appellant was thereafter advised he needed immediate surgery on his neck area. On January 14, 1986, appellant underwent surgery, which he believed was called cervical diskectomy and fusion. After the operation, appellant was told he had cervical myelopathy, as opposed to multiple sclerosis.

Appellant avers that prior to January 14, 1986, he "was never given any indication * * * that he did not have multiple sclerosis" or that the diagnosis of multiple sclerosis was incorrect. Appellant further denied that Dr. Selman told him on September 4, 1985 that he was probably suffering from cervical myelopathy.

Appellees point to a letter dated September 4, 1985 from Dr. Selman to Dr. Elizabeth Kamenar, which states in pertinent part that Dr. Selman told appellant "he should undergo a surgical procedure * * * [which] would be more of [a] prevention of further deterioration * * *." The letter states that appellant wished to delay surgery until the first of the year. Finally, Dr. Selman wrote he "suggested that we get further workup [sic] with surface coil MRI studies of both [appellant's] cervical and lumbar spine in order to determine if a myelogram will be necessary preoperatively."

Based on the above evidence, the trial court initially rendered summary judgment for all defendants except Dr. Toledo. Appellants timely appealed, raising three assignments of error. Thereafter, appellee Dr. Shannon filed a motion to dismiss the appeal pursuant to Civ.R. 54(B), which was rendered moot by the trial court's subsequent journal entry granting summary judgment in favor of defendant Dr. Toledo. Appellants failed to file a timely notice of appeal as to the granting of summary judgment in favor of defendant Dr. Toledo. The remaining defendants, however, are parties to this appeal.

We will consider appellants' three assignments of error jointly. They state:

## ASSIGNMENT OF ERROR I

"The trial court erred in granting the motion for summary judgment of defendants-appellees, when the motion lacked proper documentary evidence."

## ASSIGNMENT OF ERROR II

"The trial court erred in granting the motion for summary judgment of defendants-appellees, when, from the evidence presented, a genuine issue of material fact exists."

## ASSIGNMENT OF ERROR III

"The trial court erred in granting summary judgment to defendants-appellees for the reason that plaintiffs-appellants' cause of action did not accrue until after January 14, 1986, when, after surgery, plaintiff was told that he suffered not from multiple sclerosis, which he had been diagnosed for nine years as having, but rather from cervical myelopathy."

Appellants contend insufficient documentary evidence exists to support a summary judgment in favor of appellees. Appellants argue their cause of action did not accrue until after January 14, 1986, when, after surgery, appellant was told that he suffered from cervical myelopathy and not multiple sclerosis. Appellees, on the other hand, argue appellants' cause of action accrued on September 4, 1985, when appellant was told his condition was related to bony spurs on his neck. Appellees contend that on September 4, 1985, he should have known that a misdiagnosis had been made or, at the very least, he should have been put on notice for further inquiry as to the cause of his condition. We find appellants' arguments have merit.

R.C. 2305.11(A), in effect at the time the instant cause of action was filed, mandates that a medical malpractice action be brought within one year after the cause of action has accrued. R.C. 2305.11(B), at the time, allowed the statute of limitations to be tolled for one hundred eighty days if, prior to the expiration of the one-year period, the claimant who allegedly possesses a medical malpractice claim against a doctor gives written notification of said claim to the doctor.

Under R.C. 2305.11(A), a cause of action for medical malpractice accrues and the statute of limitations commences to run when the patient discovers or, in the exercise of reasonable care and diligence, should have discovered the resulting injury. *Oliver v. Kaiser Community Health Found.* (1983), 5 Ohio St.3d 111, 5 OBR 247, 449 N.E.2d 438. It has been stated that in making such determinations, the trial court must make the following determinations:

"[W]hen the injured party became aware, or should have become aware, of the extent and seriousness of his condition; whether the injured party was aware, or should have been aware, that such condition was related to a specific professional medical service previously rendered him; and whether such condition would put a reasonable person on notice of need for further inquiry as to the cause of such condition." (Citations omitted.) *Hershberger v. Akron City Hosp.* (1987), 34 Ohio St.3d 1, 516 N.E.2d 204, paragraph one of the syllabus.

Since the *Hershberger* decision, the Ohio Supreme Court has refined the tripartite analysis contained therein by adding the "cognizable event" element to the foregoing test. Thus, in *Allenius v. Thomas* (1989), 42 Ohio St.3d 131, 133, 538 N.E.2d 93, 96, the court held:

"The 'extent and seriousness of his condition' language of the [*Hershberger* test] * * * requires that there be an occurrence of a 'cognizable event' which does or should lead the patient to believe that the condition of which the patient complains is related to a medical procedure, treatment or diagnosis previously rendered to the patient and where the cognizable event does or should place the patient on notice of the need to pursue his possible remedies."

In the present case, appellees argue the cognizable event occurred on September 4, 1985. Appellees contend appellant was told his condition was related to bony spurs on his neck. Appellees contend appellant was told of the need for surgery to remove said spurs and further argue they should not be held responsible for appellant's decision to delay surgery until the beginning of the new year. At the very least, it is argued, appellant was put on notice of the need to pursue his possible remedies.

Appellees place considerable emphasis on a letter dated September 4, 1985 from Dr. Selman to Dr. Kamenar wherein Dr. Selman relates he told appellant "that in light of an extradural compression he should undergo a surgical procedure * * * [which] would be more of [a] prevention of further deterioration * * *." Dr. Selman further writes that appellant "wished to delay surgery until the first of the year and I suggested * * * coil MRI studies of both his cervical and lumbar spine in order to determine if a myelogram will be necessary preoperatively." The letter further acknowledges appellant's diagnosis of multiple sclerosis since 1976, but nowhere in the letter does Dr. Selman suggest that this diagnosis is incorrect or that appellant was made aware of an incorrect diagnosis.

■ While the record indicates, at best, that appellant was informed he had bony spurs on his neck and was aware of the need for surgery, there is nothing in the record to suggest that appellant's condition was solely related

to the bony spurs, as suggested by appellees, and not multiple sclerosis, or that appellant was ever so informed. Dr. Selman's letter does not suggest that the original diagnosis of multiple sclerosis was incorrect or that appellant was informed of an incorrect diagnosis. Dr. Selman's letter further indicates that the suggested surgery would be more preventative of further deterioration than corrective. This is inconsistent with appellees' suggestion that appellant knew his condition was related to bony spurs which apparently are surgically correctable. Moreover, nothing in the record indicates that a sense of urgency existed to remove the bony spurs or that appellant was made aware of any urgency. Thus, as of September 4, 1985, there is nothing in the record which would indicate appellant was aware of an alleged incorrect diagnosis or that would put appellant on notice of the need to pursue his possible remedies.

To the contrary, appellant's affidavit clearly states that prior to January 14, 1986, he "was never given any indication whatsoever that I did not have multiple sclerosis, * * * [and] I had no reason whatsoever to believe that the diagnosis of multiple sclerosis was not correct." Additionally, appellant's deposition testimony merely suggests he was aware of bony spurs on his spinal column and of the need to have them surgically removed. Further, it was appellant's understanding that Dr. Selman did not feel it was urgent to have the surgery done, and nothing in the record suggests that it was urgent. Moreover, nowhere in the record is there any indication that appellant was made aware that the original diagnosis of multiple sclerosis was incorrect until January 14, 1986.

This situation is quite similar to *Allenius, supra*, 42 Ohio St.3d at 134, 538 N.E.2d at 96, wherein the court found the "cognizable event" was when plaintiff-appellee learned, on November 5, 1982, she had invasive cancer as opposed to when she was told, on October 12, 1982, that the results of a pap smear were found to contain Class III cells, which gives an inconclusive result of the existence of cancer. The court explained the result of the October 12th pap smear "was not a 'cognizable event' because it would not have alerted appellee that Dr. Barnes and Dr. Thomas had improperly diagnosed her if, in fact, any misdiagnosis did occur." *Id.* Similarly, on September 4, 1985, appellant herein was told of the existence of bony spurs on his neck and of the need to have them surgically removed, but no evidence exists suggesting that he was then told of any error in the original diagnosis of multiple sclerosis. Moreover, there is nothing in the record which would have alerted appellant that a misdiagnosis had, in fact, occurred until he was told of such on January 14, 1986.

Furthermore, the present case is quite similar to *Herr v. Robinson Mem. Hosp.* (1990), 49 Ohio St.3d 6, 550 N.E.2d 159. In *Herr,* the Ohio Supreme Court found "the cognizable event occurred on August 22, 1985, when [plaintiff-]appellant was first informed by Dr. Pryce that he had a broken vertebra. Prior to that time, appellant followed the advice of the appellee doctors and permissibly relied on the assurances of one of those doctors." *Id.* at 9, 550 N.E.2d at 162. Likewise, the record in the instant case indicates that appellant merely followed the advice of his doctors, notwithstanding appellant's decision to delay surgery until the first of the year. The record indicates no urgency existed in performing such surgery, nor that any sense of urgency was ever communicated to appellant. On the contrary, the record shows appellant was first told of the misdiagnosis on January 14, 1986. Until then, appellant had not been given any indication that he did not have multiple sclerosis or that his condition was not related to multiple sclerosis.

Finally, we note the case of *Fisher v. Deerhake* (1987), 41 Ohio App.3d 139, 534 N.E.2d 930, is also persuasive in our disposition of the present case. In *Fisher,* plaintiff-appellant received medical attention for his right arm beginning on July 1, 1983 through November 1983, when he was admitted to Ohio State University Hospitals, where a surgical procedure was performed on his shoulder on November 28, 1983. He eventually developed a chronic decubitus ulcer which ultimately required his admission to the Medical College of Ohio. While a patient at the facility, he was told on or about October 20, 1984 that his shoulder condition was permanent and may have resulted from neglectful care on the part of an earlier attending physician. Appellant filed suit on August 19, 1985. However, the trial court found appellant's cause of action was barred by the statute of limitations. The court of appeals, however, reversed, stating "it would be impossible for the trial court to determine when, in the exercise of reasonable diligence, Fisher should have discovered his injury." *Id.* at 141, 534 N.E.2d at 932. The appellate court noted "there is nothing in the record to indicate that Fisher was told anything by his doctors from July 1, 1983 through August 19, 1984." *Id.* Rather, it was not until October 20, 1984 that Fisher was told that his shoulder condition might have resulted from neglectful care of an earlier attending physician.[1] Likewise, there is nothing in the present record to indicate that appellant was told of an alleged misdiagnosis by his doctors until January 14, 1986.

---

1. The court in *Fisher, supra,* nonetheless rejected Fisher's arguments that "the statute of limitations did not commence to run until he was told that he had a *permanent* injury which was the result of neglect on the part of his treating physician." (Emphasis *sic.*) *Id.* at 141, 534 N.E.2d at 933. The court's decision was based on the insufficiency of the record to conclusively determine when the statute of limitations began to run.

Therefore, since there is nothing in the record to indicate that appellant was made aware that he did not have multiple sclerosis until he was told as much by Dr. Selman on January 14, 1986, or that he should have been put on notice of the need to pursue his possible remedies, until January 14, 1986, we hold the trial court erred in granting appellees' motions for summary judgment.

■ At the very least, the cognizable event occurred on January 14, 1986, when appellant was informed of the alleged misdiagnosis or was put on notice of the need to pursue his possible remedies. Thus, appellants had to file suit by January 13, 1987 or serve notice of claim on the defendants and file suit within one hundred eighty days thereafter. Appellants served the statutory one-hundred-eighty-day notice ·on defendant Kaiser on September 30, 1986, defendants Afonja, Aymat and Sekerak on October 7, 1986, and defendant Shannon on August 21, 1986 and filed suit on February 5, 1987 within one hundred eighty days, pursuant to R.C. 2305.11(B) then in effect.

Therefore, the trial court erred in granting defendants-appellees' motions for summary judgment.

Appellants' three assignments of error are sustained.

*Judgment reversed*
*and cause remanded.*

JOHN F. CORRIGAN, J., concurs.

KRUPANSKY, J., dissents.

KRUPANSKY, Judge, dissenting.

I respectfully dissent from the majority opinion in the case *sub judice* for the reason that the record clearly shows there was a "cognizable event" on September 4, 1985 which put appellant on notice to inquire as to his condition. Since appellant failed to file his action within a year of that date, summary judgment for appellees was properly granted.

As the majority correctly notes, in explanation of its holding in *Hershberger v. Akron City Hosp., supra,* the Supreme Court stated the following:

"[T]he 'extent and seriousness of his condition' language of the [*Hershberger* test] * * * requires that there be an occurrence of a 'cognizable event' which *does or should lead the patient to believe that the condition of which the patient complains is related to a medical procedure, treatment or diagnosis previously rendered to the patient* and where the cognizable event *does or should place the patient on notice* of the need to pursue his possible remedies." (Emphasis added.) *Allenuis v. Thomas* (1989), 42 Ohio St.3d 131, at 133, 538 N.E.2d 93, at 96.

In the case *sub judice,* the cognizable event which did or should have placed appellant on notice was appellant's visit with Dr. Selman which occurred on September 4, 1985, when Dr. Selman discussed with appellant the spurs on his cervical vertebrae and recommended *surgery.*

The language of *Allenuis* states the test is whether the event "does *or should* place the patient *on notice."* There is no requirement as the majority suggests that the patient needs to be *told* of a previous misdiagnosis. Moreover, the standard is that of a "reasonable person." *Oliver v. Kaiser Community Health Found.* (1983), 5 Ohio St.3d 111, 5 OBR 247, 449 N.E.2d 438. There is nothing in the record of the case *sub judice* to suggest appellant was not a reasonable person.

Furthermore, the record reveals appellant was referred to Dr. Selman for analysis of his *neurological condition.* The New College Edition of the American Heritage Dictionary of the English Language (Houghton Mifflin Co. 1976) defines "multiple sclerosis" as "a degenerative disease of the *central nervous system* in which hardening of tissues occurs throughout the brain or spinal cord or both."

Specifically, the medical records indicate Dr. Kamenar, appellant's treating physician just prior to his referral to Dr. Selman, began in May 1985 to question whether *appellant had cervical myelopathy.* Appellant was ultimately referred to University Hospitals for further consultation. Appellant saw Dr. Selman on September 4, 1985. Thereafter, Dr. Selman wrote to Dr. Kamenar under date of September 4, 1985 as follows:

"I saw Paul Tober on September 4, 1985. He is a 48 year old right-handed man without medical problems. *He had a diagnosis of multiple sclerosis since 1976.* His initial problem came from left knee weakness. He had a history of playing volleyball previously although there was no acute incident that he remembers with pain. After many procedures and work up including a knee operation in 1976 he was managed with Lioresal for occasional leg spasticity.

"Now *he complains of continued knee weakness as well as decreased dexterity in the left hand and occasional numbness of the right leg.* There are no bowel symptoms although he does report increasing constipation since 1978.

"His physicl [*sic*] examination shows the motor strength is 5 out of 5 and symmetrical except for his left foot dorsiflexion which appears to be recovering from the weakness at or around the time of knee surgery. His deep tendon reflexes are accentuated to 3 to 4+ from the triceps on down except only a 1+ at his ankles bilaterally. He has a left upgoing toe and the right is

downgoing. There was no clonus. He has bilateral Hoffman's signs. His position sense is intact.

*"The MRI shows an extradural defect most prominently at 5–6 but also a small defect at 4–5.*

*"I told Mr. Tober that in light of this extradural compression he should undergo a surgical procedure.* I explained that it may not be possible to regain lost function and our goal would be more of prevention of further deterioration although *it is possible that he would receive some benefit to his previous loss of dexterity and spasticity.* Mr. Tober *wished to delay surgery until the first of the year* and I suggested that we get further workup [*sic*] with surface coil MRI studies of both his cervical and lumbar spine in order to determine if a myelogram will be necessary preoperatively." (Emphasis added.)

Thus, Dr. Selman was suggesting two things, *viz.*, (1) that appellant undergo surgery on his neck and (2) that this surgery would likely bring neurological benefits. Since multiple sclerosis is a neurological disease and appellant is presumed to be a reasonable person, it is frankly beyond comprehension that upon being told he needed surgery on his neck (which, of course, is so near the brain that the surgery would engender some concern therefor), appellant would not have asked two simple questions, *viz.*, (1) why is surgery necessary?; and (2) does the condition for which you recommend surgery have anything to do with my multiple sclerosis?

The majority opinion places emphasis on the fact that surgery was able to be postponed, stating that "nothing in the record indicates that a sense of urgency existed to remove the bony spurs or that appellant was made aware of any urgency." However, this begs the question. It was appellant who made the decision to postpone surgery for personal reasons until January 1986. It is clear from the letter to Dr. Kamenar that Dr. Selman only suggested further diagnostic procedures since appellant did not want to have surgery at that time. Thus, it is not sufficient to prove appellant was *not* put on *notice to inquire.*[2]

The majority opinion herein thus ignores the holding of *Allenius v. Thomas, supra,* and requires the "cognizable event" to be the time when appellant states he was *actually informed* of the misdiagnosis of multiple sclerosis contrary to the case law as promulgated by the Ohio Supreme Court. Even

---

**2.** A further question is thus also raised that is pertinent to this court's inquiry: *viz.*, was Dr. Selman unable to determine that appellant's condition was not due to multiple sclerosis until he operated? If Dr. Selman had no knowledge appellant's condition was a result of cervical myelopathy until his surgery on January 14, 1986, how could there be malpractice in the previous doctors' actions before that date?

construing the available evidence most strongly in favor of appellant, reasonable minds could only conclude appellant was *put on notice* and that he *should have inquired* as to his condition on September 4, 1985. Since he did not so inquire, and since his action against appellees was filed beyond the applicable statute of limitations under R.C. 2305.11(A), appellees' motions for summary judgment were properly granted.

Accordingly, appellant's second and third assignments of error lack merit and the summary judgment of the trial court should be affirmed.