**FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff–Appellant,**

v.

**Ronald E. ALEXANDER and Buckingham, Doolittle & Burroughs, Defendants–Appellees.**

No. 94–4229.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 6, 1996.

Decided March 21, 1996.

LaVern A. Pritchard (argued and briefed), Minneapolis, MN, for F.D.I.C.

Timothy T. Reid, D. Cheryl Atwell (briefed), Reid, Berry & Stanard, Cleveland, OH, for Ronald E. Alexander.

Gerald A. Messerman (argued and briefed), Duvin, Cahn & Hutton, Cleveland, OH, Philip S. Kushner (briefed), Messerman & Messerman, Cleveland, OH, for Buckingham, Doolittle and Burroughs.

Before ENGEL, BROWN, and MILBURN, Circuit Judges.

BROWN, J., delivered the opinion of the court, in which ENGEL, J., joined. MILBURN, J. (pp. —— – ——), delivered a separate dissenting opinion.

BAILEY BROWN, Circuit Judge.

In this legal malpractice case, the Federal Deposit Insurance Corporation (FDIC), which has taken over for the now-dissolved

Resolution Trust Corporation (RTC),[1] appeals from a grant of summary judgment for the defendants, an attorney and his law firm. The district court held that Ohio's one-year statute of limitations barred the malpractice claim, which arose out of events that occurred in 1986 involving the defendants and the First Savings and Loan Company of Massillon, Ohio (First Savings). We agree and AFFIRM.

## I. FACTS AND BACKGROUND

In December of 1985, the board of directors of First Savings requested and received the resignation of its president of eight years, H. William Troop. First Savings retained the services of attorney Ronald Alexander and his firm, Buckingham, Doolittle & Burroughs (the Buckingham firm), to investigate Troop's actions and any possible legal recourse against Troop. Alexander reviewed materials relating to three large commercial loans which Troop had made, and which were First Savings's main concern at the time. First Savings expected to incur losses on the three loans but had not yet done so. Alexander also reviewed, among other things, an insurance policy First Savings held, which protected it from losses caused by the misconduct of its directors and officers (the D & O Policy). The subject of this suit is the alleged negligence of Alexander in the loss of First Savings's potential claim against the insurance company based on the conduct of Troop.

On January 6, 1986, Alexander made his initial presentation of his findings and opinions at a special meeting of the First Savings board. According to the minutes of that meeting, Alexander discussed the possibility that Troop had committed a "breach of duties," and Alexander "[f]elt this would be difficult to litigate inasmuch as no written job description existed." Alexander also discussed why the loans which he had investigated had potential losses, and he discussed a number of potential adverse effects that litigating a claim against Troop could have on the company. Alexander concluded by stating that the directors "must continue to inquire for information and facts" and then "make a decision at the next regular board meeting as to what course of action they want to pursue."

Two weeks later, Alexander wrote an opinion letter to the board, more fully detailing his conclusions and the bases for them. Alexander first advised the board that it would be "difficult" to argue that Troop had committed a breach of contract, because (1) there was no written employment contract or job description for the First Savings president, and (2) First Savings had not had formal underwriting guidelines when the loans were made.

Alexander then considered whether claims could be made against Troop for breaches of his fiduciary duties as an officer and director of First Savings. With regard to two of the loans investigated, Alexander opined that it would be "difficult" to claim Troop breached his fiduciary duties in making them. Basing claims against Troop on these two loans would be problematic because First Savings's loan department employees had improperly handled mechanical details, such as property appraisal and the perfection of security interests. Alexander noted that Troop could argue he had reasonably relied on the other employees to handle such matters. Thus, Alexander stated, "The probability that [First Savings] can recover from Mr. Troop any losses ultimately arising from these two loans is remote."

With regard to a third loan, however, Alexander explained that any loss incurred would stem from a failure which could be charged to Troop. Though Alexander deemed this to be First Savings's "potentially best claim," Alexander concluded for other reasons that "the probability of success in that claim is not likely."

Alexander went on to say that First Savings did not then "have a clear right of recovery" from Troop and that, "even if loss is ultimately incurred, the possibilities of recovery are *only probable*, at best." Alexan-

<hr/>

1. *See* 12 U.S.C. § 1441a(m) (1994) (terminating the RTC as of December 31, 1995, and appointing the FDIC as its successor).

der also suggested that the board, before it made a "final decision whether to pursue this matter further," should weigh three factors beyond the likelihood of recovery: potentially high (and unrecoverable) litigation expenses, time that would be lost by officers, directors, and employees, and adverse media attention which could hurt First Savings in the marketplace.

The First Savings board met the next day to review Alexander's letter. According to the minutes of that meeting, each board member commented about the various factors and the likelihood of success. The board then voted unanimously not to act against Troop at that time, but stated that it wanted to "leave open an avenue for possible future action if evidence would warrant it."

In December of 1986, as its D & O Policy for the relevant time period was about to expire, First Savings asked Alexander to draft a letter giving notice of existing and potential claims to its insurer. The letter, dated December 30, 1986, gave the insurer notice of various claims against officers and directors of First Savings, but it included nothing about a claim against former president Troop for breach of contract or fiduciary duties.

Gene Boerner, who was then president of First Savings, testified that he was aware the letter contained no claim against Troop, and that "he would have known," as a practical matter, that the absence of such a claim meant First Savings's claims against Troop would not be satisfied. The board, Boerner said, had wanted to pursue claims against Troop, but "the chances of success were less than 50–50 as I remember and it was not a situation that Ron Alexander suggested that we enter into." Billing records and other evidence reflect that Alexander and the Buckingham firm continued to represent First Savings in matters involving the D & O Policy and director and officer liability in general after writing this letter. That representation did not involve any claims against Troop, however, because the claim letter to

First Savings's insurer asserted no such claims. The commercial loans which Troop had made eventually went into default, causing First Savings to lose more than $3 million.

First Savings failed, and the RTC was appointed as its receiver on April 19, 1990. The RTC filed this suit in the district court on April 16, 1993, alleging primarily that (1) Alexander was negligent in investigating the possible claims against Troop, and (2) the Buckingham firm failed to supervise Alexander properly. In October of 1994, the district court entered summary judgment for the defendants on the grounds that *all* of the RTC's claims were time-barred.[2] The RTC timely appealed. While that appeal was pending, so-called "sunset" legislation ended the life of the RTC, and the FDIC assumed all cases which the RTC had pending. 12 U.S.C. § 1441a(m) (1994). For the sake of continuity, we shall refer to the RTC in the remainder of this opinion.

## II. ANALYSIS

### A. Standard of review.

■ We review the district court's grant of summary judgment *de novo*, using the same test the district court used. *E.g., City Management Corp. v. U.S. Chem. Co.*, 43 F.3d 244, 250 (6th Cir.1994). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

### B. The statute of limitations.

■ The RTC was never allowed to resurrect claims which had lapsed under state statutes of limitations when it was appointed receiver. *E.g., Resolution Trust Corp. v. Seale*, 13 F.3d 850, 853 (5th Cir.1994). Thus, the parties agree that state law, in this case Ohio law, is dispositive on the threshold

---

**2.** The district court, having determined that the defendants were entitled to judgment as a matter of law on all of the RTC's claims, did not reach the merits of the malpractice case, which Alexan-

der had argued in his separate summary judgment motion. The court denied that motion as moot.

question of whether any legal malpractice claims against the defendants lapsed before the RTC was appointed receiver for First Savings. In Ohio, legal malpractice claims must be brought within one year from the date the cause of action accrues. Ohio Rev. Code Ann. § 2305.11(A) (Baldwin 1994). The leading Ohio case holds that a legal malpractice claim "accrues," and the statute begins to run, on the later of two dates: (1) "when there is a cognizable event whereby the client discovers or should have discovered that his injury was related to his attorney's act or non-act and the client is put on notice of a need to pursue his possible remedies against the attorney" or (2) "when the attorney-client relationship for that particular transaction or undertaking terminates." *Zimmie v. Calfee, Halter & Griswold*, 43 Ohio St.3d 54, 538 N.E.2d 398, 401 (1989). Thus, a court must examine both dates, and the later of the two will control when the statute begins to run. *Id.*

### C. The "cognizable event."

■ In determining when the "cognizable event" took place under *Zimmie*, a court must explore the facts of the case and determine

> when the injured party became aware, or should have become aware, of the extent and seriousness of his or her alleged legal problem; whether the injured party was aware, or should have been aware, that the damage or injury alleged was related to a specific legal transaction or undertaking previously rendered him or her; and whether such damage or injury would put a reasonable person on notice of the need for further inquiry as to the cause of such damage or injury.

*Omni–Food & Fashion, Inc. v. Smith*, 38 Ohio St.3d 385, 528 N.E.2d 941, 944–45 (1988). The district court applied this rule and held that First Savings knew, or should have known, that it had a legal problem related to Alexander's advice, with respect to a claim involving Troop, on December 31, 1986, when Alexander had written the letter on behalf of First Savings to the D & O

Policy insurer and had omitted a claim against Troop. The court reasoned that, at that time, First Savings knew that (a) it was giving up its right to pursue a claim against the insurance company based on Troop's conduct, and (b) it was doing so in reliance on Alexander's advice from earlier in the year. Moreover, the court reasoned, First Savings could use Alexander's letter of January 20, 1986, to measure the extent and propriety of his investigation of Troop.

The RTC argued (as it does on appeal) that the statute never began to run under this portion of the *Zimmie* test, because First Savings never had notice that Alexander's conduct was malpractice. The district court rejected that argument, however, on the grounds that Ohio law does not require actual notice that a legal wrong was done. Rather, Ohio law requires only "*constructive* knowledge of facts, rather than *actual* knowledge of their legal significance ... to start the statute of limitations running." *Flowers v. Walker*, 63 Ohio St.3d 546, 589 N.E.2d 1284, 1287 (1992); *see also, e.g., Zimmie*, 538 N.E.2d at 402 (stating that an injured person need not know the full extent of an injury before there is a cognizable event). The RTC argues that the district court "fundamentally misappl[ied]" this constructive notice doctrine in concluding that its action was time-barred.

■ We find no error in the district court's analysis of the constructive notice doctrine as it applies to this case. In the *Flowers* case, the plaintiff had a mammogram in November of 1986, and her gynecologist, who was not the physician who read the mammogram, told her it was negative. She then discovered she had breast cancer on July 1, 1987. The defendant doctor who misread the mammogram argued that July 1, 1987, was the date of the "cognizable event" for limitations purposes. The plaintiff argued, however, that the "cognizable event" was the date she discovered the identity of the defendant doctor, which would have brought her claim within the one-year time limit.[3] The Supreme Court of Ohio held the

---

3. According to the Ohio Supreme Court, "the same principles that determine the accrual of the cause of action in medical malpractice claims

plaintiff's claim time-barred, stating that "[a] plaintiff *need not have discovered all the relevant facts* necessary to file a claim in order to trigger the statute of limitations. Rather, the 'cognizable event' itself *puts the plaintiff on notice to investigate* the facts and circumstances relevant to her claim in order to pursue her remedies." *Id.* at 1287–88 (citations omitted) (emphases added). Once the "cognizable event" occurs, a plaintiff has two duties: (1) to determine whether malpractice proximately caused the injury, and (2) to discover the identity of the tortfeasor(s). *Id.* at 1288.

Applying the *Flowers* rationale to the instant case, we hold that First Savings knew or should have known, given Alexander's December 30, 1986 claim letter to its D & O Policy insurer, that it was then not pursuing any claims it might have had against Troop with its insurer. First Savings also knew or should have known that its decision not to pursue those claims was based upon the advice which Alexander had given the board earlier that year. Thus, at that point, First Savings had an "injury," the loss of collectible claims against Troop, and it knew that its injury "was related to [Alexander's] act or non-act." *Zimmie,* 538 N.E.2d at 401. This was the cognizable event, and its occurrence meant that First Savings was on notice, during the coming year, of its duty to investigate the matter and determine whether or not any legal malpractice proximately caused the injury and, if so, who was responsible. *See Flowers,* 589 N.E.2d at 1288.

■ The RTC advances the proposition that a "cognizable event" occurs in legal malpractice cases when someone tells the client that his attorney erred—that is, when someone gives a client *actual knowledge* that he has suffered an injury. While the argument is interesting, none of these cases persuades us that this is the law in Ohio. Rather, the cases indicate that, absent a prior cognizable event that would put a reasonable person on notice, the gaining of actual knowledge of malpractice may itself become the cognizable event.

also govern in legal malpractice actions." *Zim-*

For example, in *Koch v. Gross,* 64 Ohio App.3d 582, 582 N.E.2d 51 (1990), the plaintiff sued her divorce attorney for malpractice, alleging that the attorney negligently drafted a separation agreement such that it was unenforceable. The trial court granted the attorney summary judgment, holding, *inter alia,* that the cognizable event was the point in time when the client became subjectively dissatisfied with her attorney. The appellate court reversed on the cognizable event issue, holding that there was a genuine factual issue as to when the client discovered or should have discovered that the attorney's improper drafting of the agreement had caused her harm. *Id.* at 53. According to the court, the client did not discover that her problems were related to her divorce attorney's negligent drafting until her new attorney told her so, and thus that was the cognizable event because only then did she know that she had an unenforceable agreement. Before that, the client's former attorney had told her that her former husband would not fulfill his obligations, and she had believed that was why the agreement was unenforceable, and she had no reason to disbelieve that attorney.

The instant case is easily distinguishable from *Koch.* There is no genuine issue of material fact about when First Savings knew that no insurance claims would be made with respect to the conduct of Troop: it knew that those claims were lost on December 30, 1986, and it knew precisely why. No one—certainly not Alexander or the Buckingham firm—led First Savings to believe that some reason *other* than Alexander's advice or investigation had led to its foregoing of claims with respect to Troop. First Savings had all the facts it needed to put it on notice that it had a legal problem, the loss of an insurance claim with respect to Troop, which Alexander had handled. Under Ohio law, that is all First Savings needed for its claim to accrue and the statute of limitations to begin to run.

The RTC also relies on two medical malpractice cases for the proposition that Alexander's investigation and judgment were tantamount to a "misdiagnosis" of First Savings's claims against Troop, and hence the

*mie,* 538 N.E.2d at 401.

cognizable event can only occur when another attorney, like another doctor, detects the misdiagnosis. *See Herr v. Robinson Memorial Hosp.,* 49 Ohio St.3d 6, 550 N.E.2d 159 (1990); *Tober v. Kaiser Found. Hosps.,* 79 Ohio App.3d 333, 607 N.E.2d 469 (1992). The RTC reasons that lay people (like the First Savings board members) may rely on attorneys' opinions just as lay people rely on doctors' opinions, and that lay people are unable to detect errors in the work of either doctors or attorneys until another member of the profession does so for them.

█ Again, the argument is interesting but incorrect. We have no quarrel with the general proposition that lay people are entitled to rely on the opinions of doctors and lawyers. That does not, however, support a rule of law that would allow someone who *knows* they have lost a potentially collectible legal claim (i.e., the claim First Savings might have made with its D & O Policy insurer) to wait until someone else tells them malpractice was committed, which could be, as it was in the instant case, many years after the fact. This is so because, again, one need not detect malpractice itself under Ohio law to start the running of the statute of limitations. One need only detect a legal problem, a relationship to a specific legal service or transaction, and a need for further inquiry. *Flowers,* 589 N.E.2d at 1287–88; *Omni–Food & Fashion,* 528 N.E.2d at 944–45.

Moreover, both of the medical malpractice cases which the RTC cites to support its "misdiagnosis" argument are distinguishable on the same crucial ground: the plaintiffs in those cases did not know the origin of their injuries, or that malpractice might have proximately caused them, until someone—another doctor—informed them. The plaintiffs in *Herr* and *Tober* lived with prolonged medical problems without knowing the precise nature of those problems, because no facts alerted the plaintiffs to the possibility that a misdiagnosis had occurred. *Herr,* 550 N.E.2d at 160; *Tober,* 607 N.E.2d at 470.

Conversely, First Savings knew on December 30, 1986, that it had lost potentially valid (if problematic) legal claims against its insurance company based on the conduct of Troop,

and it knew that it had relied on Alexander's advice in opting not to pursue those claims. There was no mystery about the origin of the loss, or about who was involved with it.

Finally, we note that the RTC, in its appellate brief, engaged in some selective quotation when it handled a recent case in this court, *Charash v. Oberlin College,* 14 F.3d 291 (6th Cir.1994). It is true, as the RTC points out, that the *Charash* court stated that constructive notice is "generally . . . an issue of fact, and is normally determined by a jury." *Id.* at 300 (citations omitted). That court went on, however, to state that the issue "can be decided on a summary judgment motion if the movant can show that no issues of material fact exist." *Id.* (citation omitted). The RTC omitted the latter quotation, which we believe more accurately describes the instant case.

Thus, the district court correctly held that there was no genuine dispute as to any material fact, and that under the "cognizable event" prong of *Zimmie,* the RTC's claim against the defendants was time-barred. As heretofore indicated, however, we still must determine when the attorney-client relationship in this case terminated.

## D. The termination of the attorney-client relationship.

█ Under *Zimmie,* for purposes of the accrual of a legal malpractice claim, an attorney-client relationship ends "when the attorney-client relationship for that *particular transaction* or *undertaking terminates.*" *Zimmie,* 538 N.E.2d at 401 (citing *Omni–Food & Fashion,* 528 N.E.2d at 942). The Supreme Court of Ohio, in adopting this rule, expressly rejected an argument that "continued 'general' representation should toll the statute of limitations," drawing an analogy to the medical malpractice rule that limited the tolling of the statute to a doctor's "continuous treatment of a 'condition.'" *Omni–Food & Fashion,* 528 N.E.2d at 944 (quoting *Frysinger v. Leech,* 32 Ohio St.3d 38, 512 N.E.2d 337, 338 (1987)). That court viewed the "particular transaction" rule as "prudent and fundamentally fair to all parties concerned. In our view, a different standard could defeat

the purpose of the statute of limitations where, for example, a client with knowledge of an attorney's malpractice may unduly perpetuate the attorney's potential liability and exposure to suit." *Id.* That court also stated that "the question of when an attorney-client relationship for a particular undertaking or transaction has terminated is necessarily one of fact." *Id.*

The RTC argues that there is evidence from which one could reasonably infer that Alexander and the Buckingham firm continued to represent First Savings with regard to "director and officer liability matters" until April of 1989. Thus, it contends, the date on which the attorney-client relationship terminated in this case is a disputed question of fact.

▌ In our view, the language of *Omni–Food & Fashion* mandates that we reject the RTC's argument. The record reflects that Alexander and the Buckingham firm did continue a "general" representation of First Savings for director and officer liability matters long after December 31, 1986. That sort of general relationship is not, however, enough to toll the statute of limitations. The attorney-client relationship for the "particular transaction or undertaking" of investigating and asserting claims based on Troop's conduct ended when no such claims appeared in the claim letter of December 30, 1986. Since the claims involving Troop then ceased to exist as a practical matter (and since Boerner and First Savings knew that was the case), we cannot see how the attorney-client relationship for that "particular transaction or undertaking" could have continued.

## III. CONCLUSION

Because any claims which First Savings might have had against the defendants lapsed long before the RTC was appointed receiver, we AFFIRM the district court's award of summary judgment to the defendants.

MILBURN, Circuit Judge, dissenting.

In concluding that First Savings knew or should have known that it had been injured by Alexander when it surrendered its legal claims against Troop in December 1986, the majority relies on the Ohio Supreme Court's decision in *Flowers v. Walker*, 63 Ohio St.3d 546, 589 N.E.2d 1284 (1992). However, the majority fails to recognize that in *Flowers*, an external event triggered the plaintiff's awareness of her injury and her need to investigate the possibility of a medical malpractice action. When Mrs. Flowers was diagnosed with breast cancer, she received a signal that her doctor's advice regarding her mammogram might have been unreliable. In contrast, in this case, no external event suggested that First Savings should investigate Alexander's advice when it knowingly gave up its claims against Troop. At that time, First Savings relied on Alexander's advice that there was no cause of action worth pursuing, and no event caused it to believe that Alexander's advice was unreliable. Thus, in contrast to the majority's view, First Savings could not and reasonably should not have known that it had been injured. By surrendering potential claims on Alexander's advice, First Savings merely acted as any client would in making a decision in reliance on its attorney. The fact that in this case the advice led First Savings to abandon a possible legal action against Troop is not sufficient to distinguish this case from any other action for legal malpractice.

Requiring that an external event trigger a plaintiff to investigate a potential malpractice action is consistent with other Ohio malpractice cases. *See Zimmie v. Calfee, Halter and Griswold*, 43 Ohio St.3d 54, 538 N.E.2d 398, 402 (1989) (in legal malpractice action, cognizable event occurred when trial court invalidated plaintiff's antenuptial agreement); *Koch v. Gross*, 64 Ohio App.3d 582, 582 N.E.2d 51, 54 (1990) (holding that cognizable event occurred when the plaintiff was advised of the legal malpractice by her new attorney); *Herr v. Robinson Memorial Hosp.*, 49 Ohio St.3d 6, 550 N.E.2d 159, 162 (1990) (cognizable event occurred when new doctor informed the plaintiff that he previously had been misdiagnosed); *Tober v. Kaiser Found. Hosps.*, 79 Ohio App.3d 333, 607 N.E.2d 469, 473 (1992) (same).

Therefore, I would hold that no cognizable event occurred when First Savings surren-

dered its claims against Troop in December 1986, and I would reverse the district court's order granting defendant Buckingham, Doolittle's motion for summary judgment and remand the case to the district court for a determination of the date on which plaintiff's cause of action accrued.