Geraldine FUHR, Plaintiff,

v.

SCHOOL DISTRICT OF the CITY OF HAZEL PARK, Defendant.

No. 99–CV–76360.

United States District Court,
E.D. Michigan,
Southern Division.

March 2, 2001.

Deborah L. Gordon, Royal Oak, MI, for Plaintiff.

Timothy J. Mullins, Troy, MI, for Defendant.

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

STEEH, District Judge.

This case arises out of plaintiff Geraldine Fuhr's allegation of sexual discrimination by defendant School District of the City of Hazel Park. Plaintiff's allegation of discrimination stems from the fact that she was passed over for the position of boys varsity basketball coach in favor of a male teacher. Defendant has filed a motion for summary judgment, which this court DENIES for the reasons stated below.

## FACTUAL BACKGROUND

Plaintiff was hired at Hazel Park High School ("HPHS") as a social studies teacher and coach in 1989. Charles Kirkland had been the boys' varsity basketball coach at HPHS for ten years when he decided to give up the position at the end of the 1998–1999 season. Only two candidates applied for the boys' varsity basketball coach position—plaintiff and fellow-teacher John Barnett.

In 1999, at the time of the selection process for boys' varsity basketball coach, plaintiff's experience and credentials included the following:

— 16 seasons coaching girls' basketball (including 10 years as varsity coach) and 12 seasons coaching boys basketball (including 9 years as junior varsity coach),

— 8 seasons as assistant varsity coach to Charlie Kirkland,

— many seasons conducting basketball clinics and camps,

— experience managing and coordinating basketball tournaments and tours, both domestic and international, and

— served as Social Studies department head.

John Barnett's experience at that time was as a junior high gym teacher for four years and coach of the boys freshman basketball team at HPHS for two years under plaintiff.

The collective bargaining agreement between defendant and its teachers' union provides that individuals who coach sports receive additional pay, which is calculated as a percentage of base pay. In 1999 plaintiff's base salary was approximately $66,000. Plaintiff received an additional 9% of pay for serving as coach of the junior varsity boys' basketball team, and an additional 11% of pay for serving as the coach of the girls' varsity basketball team. The pay for coaching a basketball team is the same, regardless of whether the team is boys or girls.

When Charlie Kirkland announced his resignation in March 1999, a selection committee was put together to hire his replacement. The committee consisted of Jim Anker (Superintendent), Vic Mayo (Assistant Superintendent), Dan Grant (District-wide Athletic Director), Jim Meisinger (HPHS Principal), and Tom Pratt (teacher who had been named HPHS Athletic Director for the following year). The committee was selected by Grant. Plaintiff points out that missing from the committee were the previous coach Charlie Kirkland and the current HPHS Athletic Director Dave Eldred. Kirkland ran the

basketball program at HPHS and plaintiff coached under him. Kirkland's opinion was never sought by the committee. Eldred attended nearly every home sporting event and supervised both candidates. He testified that if plaintiff had been a male, she would have gotten the job. (Eldred, pp. 49–50). Eldred testified that the natural progression in coaching is freshman, then junior varsity, then varsity. Eldred opined that plaintiff was qualified for and deserved the boys' varsity coach position, and that Barnett should have moved into the boys' junior varsity position. (Eldred, pp. 44–50). Eldred was initially asked to be on the selection committee, but was then "uninvited" on the day of the interviews by Grant, who told him that Superintendent Anker did not want him there.

Principal Meisinger testified that prior to the interviews he learned that certain Board members and Superintendent Anker were not in favor of plaintiff getting the job, citing "community problems" which Meisinger believed had no validity. Meisinger confirmed that Fuhr had no "community problems" beyond what all coaches have to contend with (parent complaints about their child being disciplined unfairly or denied adequate playing time).

Barnett was interviewed first. Anker remained in the room during his entire interview, but left a few minutes into plaintiff's interview. Teacher Tom Pratt asked plaintiff if she could coach both the Varsity boys and girls teams, to which she answered "absolutely", explaining that she had been coaching boys and girls basketball simultaneously at Hazel Park for the past ten years. There is a potential overlap between the boys' and girls' basketball seasons, depending on how the girls' team fairs in the state tournament. For example, in 1999, the girls' tournament began on November 15, the same day as the boys' team began its practice for the upcoming season. The girls' tournament ran until December 4, 1999, ending two days before the first varsity boys' basketball game. Coach Kirkland testified that based

on his experience, it would be difficult to coach both varsity girls and varsity boys basketball teams at the same time. "Somebody is going to have to cover for somebody somewhere." (Kirkland, pp. 15–16).

The committee met to discuss the candidates. Meisinger wanted plaintiff. Pratt remained neutral, but agreed that plaintiff was more qualified for the job. The other members supported Barnett, mentioning unspecified "community problems." The issue of gender came up during the committee's discussions, with Anker asking whether it would be a problem to have a female coach in the boys' locker room. (Anker, p. 106). No other reasons for not selecting plaintiff were ever mentioned.

*STANDARD FOR SUMMARY JUDGMENT*

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See FDIC v. Alexander*, 78 F.3d 1103, 1106 (6th Cir.1996). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Kutrom Corp. v. City of Center Line*, 979 F.2d 1171, 1174 (6th Cir.1992).

The standard for determining whether summary judgment is appropriate is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Winningham v. North Am. Resources Corp.*, 42 F.3d 981, 984 (6th Cir. 1994) (citing *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th

Cir.1989)). The evidence and all inferences therefrom must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Enertech Elec., Inc. v. Mahoning County Comm'r*, 85 F.3d 257, 259 (6th Cir.1996); *Wilson v. Stroh Companies, Inc.*, 952 F.2d 942, 945 (6th Cir.1992). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Hartleip v. McNeilab, Inc.*, 83 F.3d 767, 774 (6th Cir.1996).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *see also Adams v. Philip Morris, Inc.*, 67 F.3d 580, 583 (6th Cir.1995). Mere allegations or denials in the nonmovant's pleadings will not meet this burden. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Further, the nonmoving party cannot rest on its pleadings to avoid summary judgment. It must support its claim with some probative evidence. *Kraft v. United States*, 991 F.2d 292, 296 (6th Cir.), *cert. denied*, 510 U.S. 976, 114 S.Ct. 467, 126 L.Ed.2d 419 (1993).

## ANALYSIS

The parties disagree as to how this case ought to be viewed. According to defendant, plaintiff was denied a transfer from coach of the varsity girls team to the varsity boys team. Defendant argues that the fact plaintiff was not transferred from the varsity girls to the varsity boys team is not actionable because the positions are equivalent and there has been no reduction in plaintiff's pay. Plaintiff, on the other hand, views the facts as presenting a case of failure to hire her in favor of a less qualified male applicant. Additionally, plaintiff argues she should have been promoted from coach of boys junior varsity to that of boys varsity.

■ A plaintiff may establish a prima facie case of discrimination under Title VII and Michigan's Elliott–Larsen Civil Rights Act either by presenting direct evidence of intentional discrimination by the defendant or by showing the existence of circumstantial evidence which creates an inference of discrimination. *Hoffman v. Sebro Plastics*, 108 F.Supp.2d 757 (E.D.Mich.2000). Under the framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), a plaintiff satisfies the burden of establishing a prima facie case of discrimination by proving (1) membership in a protected class; (2) that she suffered an adverse action; (3) that she was qualified for the position; and (4) that she was replaced by, or treated differently than, someone outside the protected class. *Id.* at 802, 93 S.Ct. 1817. As modified for a "failure to promote" case, the test is whether plaintiff can show she belongs to a protected group, was qualified and applied for the promotion, and that another employee with similar qualifications who was not in the protected group was promoted to the position sought by plaintiff. *Brown v. State of Tennessee*, 693 F.2d 600, 603 (6th Cir.1982).

Once a plaintiff establishes a prima facie case, an inference of discrimination arises. The burden of proof then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employer's action. Once established, the burden shifts back to the plaintiff to prove that the employer's articulated nondiscriminatory reason for its action was merely pretextual. *Texas Dept. of Community Affairs v.*

*Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

Defendant argues that there has been no adverse action in this case because plaintiff could not have retained her position as girls' varsity coach and held the boys' varsity coaching position at the same time. Based on this premise, and because both positions had the same rate of pay, defendant argues that plaintiff did not suffer any adverse employment action when she was not chosen to coach the boys' varsity basketball team.

The reason defendant contends plaintiff could not coach both varsity teams is because there is an overlap between the boys' and girls' basketball seasons. The length of the overlap depends on the performance of the girls' team in the state tournament. In 1999, the girls' season finished on December 4, 1999 with the tournament finals, while the boys' first practice began on November 15—a potential overlap of three weeks. Defendant offers the opinion of Charles Kirkland, who had been the boys' varsity basketball coach at HPHS for ten years. According to Mr. Kirkland, during the preseason, he put in three hours a day for fifteen days, plus six hours for a scrimmage the day after Thanksgiving. In the regular season he would have three days of practice, totaling seven hours, each week. Games were twice a week, for a total of ten hours, plus 1½ to 2 hours after each game to review and get ready for the next day's practice. During Christmas and winter break he had practices, scrimmages and games. (Kirkland, pp. 14–15). It is only the preseason that would overlap with the girls' varsity tournament schedule. Kirkland opined that if the same person coached the girls' and boys' varsity basketball teams it would detract from at least one program. "If you're working with the girls and you've got to finish that one up, then somebody's got to deal with the boys until, you know, whoever is coaching them can get there." (Kirkland, pp. 15–16).

Defendant maintains that it has an established non-discriminatory practice of not allowing a single individual to coach two major sports when there is an overlap in the seasons. In support, defendant provides affidavits from Tom Pratt and Dan Grant, along with a chart identifying the coaches and schedules from 1990 to the present. (Defendant's Supplemental Brief, Exhibit B). Plaintiff contends that other individuals at HPHS have been permitted to coach two varsity sports. However, according to defendant, each of these instances involve sports which are played during different parts of the school year, with no overlap. For example, while Amy Houser coaches girls' and boys' varsity soccer, the seasons do not overlap at all.

Plaintiff highlights the example of Frank Stagg who was coach of varsity football and wrestling. The football season ran from August 9 until November 27 including the tournament finals, while the wrestling season began November 15. Plaintiff provides the deposition testimony of James Anker, who identifies Frank Stagg as the one exception to defendant's practice of not having a person be head coach of two major sports. (Anker, dep. at 91). Defendant does not respond to plaintiff's allegation that Frank Stagg was permitted to coach two varsity sports with overlapping seasons. It would appear that this occurred prior to the 1990–1991 season, as it is not included in Exhibit B to defendant's supplemental brief.

Recognizing the overlap in the girls' and boys' basketball seasons, plaintiff points out that she handled the overlap for ten years while she coached the girls' varsity and boy's junior varsity teams. She testifies that in applying for the boys' varsity basketball position, she "wanted to be both the varsity girls and the varsity boys coach.... No one told me that I couldn't be both. If it ever came to the point where they said you had to choose one, not because I love girls basketball any less, but because I have—I've never coached the varsity boys, I would have done that if I

had to, but I didn't want to and I could have handled both and I should have been both." (Fuhr, pp. 235–36). According to plaintiff, nobody ever told her that if she was offered the boys' varsity position she would have to choose one varsity team over the other.

In addition to relying on its alleged non-discriminatory practice of treating all varsity coaches alike, defendant cites to a number of cases from the Sixth Circuit for the proposition that something more than a slight reduction in employment level is required before finding an adverse employment action. *Bowman v. Shawnee State University*, 220 F.3d 456 (6th Cir. 2000); *Hatcher v. General Electric*, 2000 WL 245515, 2000 U.S.App. LEXIS 2837 (6th Cir.2000); *Orsini v. East Detroit Public Schools*, 1995 WL 428426, 1995 U.S.App. LEXIS 20538 (6th Cir.1995). According to defendant, a plaintiff must suffer a loss of seniority, salary or other benefits as a result of a reduction in her employment level in order to state a cause of action. Defendant contends that in this case, if plaintiff had been appointed to the position of boys' varsity coach, she would have had to give up her boys' junior varsity position as well as her girls' varsity position, and would have suffered a reduction in her total pay. Therefore, defendant maintains that its refusal to transfer plaintiff actually preserved her existing rate of pay.

However, each of the cases relied on by defendant involved an employer-imposed job transfer where the employee was required to show that the transfer was in some way adverse. In the present case, plaintiff's adverse job action was not an employer-imposed job transfer, but rather the denial of an employee-sought job transfer or promotion. The Seventh Circuit has stated that when a plaintiff applies for a transfer, "[w]hether the new position is equivalent to or better than her current job is irrelevant to whether she was qualified for, applied for, and was rejected from the position while a less qualified male was

selected. The fact that she was denied a position she applied for is adverse in and of itself." *Parker v. State, Dept. of Public Safety*, 11 F.Supp.2d 467, 477 (D.Del.1998).

■ Plaintiff has successfully raised a question of fact whether defendant in fact had an established policy of not permitting the same person to coach two varsity sports with overlapping seasons. Such a policy was never communicated to plaintiff when she applied for the boys' varsity position. Plaintiff was not asked to chose between the boys and girls varsity teams. Finally, defendant has no explanation for the Frank Stagg being able to coach two varsity sports with overlapping schedules.

■ The court does not agree with defendant's characterization of plaintiff's claim as being one of discriminatory failure to transfer. Rather, the court will analyze plaintiff's claim as one of discriminatory failure to hire or promote. Plaintiff argues that the denial of the boys' varsity coach position was an adverse action whether viewed as a failure to promote case or a failure to hire case. Plaintiff argues that defendant failed to promote her from boys' junior varsity coach to varsity/head coach, where she would have been in charge of the entire boys' basketball program, providing direction to and supervising the junior varsity and Ninth grade coaches. In this way, the job was clearly a promotion with higher visibility, a more distinguished title, and higher pay. In employment law, adverse action includes the failure to promote. *Board of County Com'rs, Wabaunsee County, KS v. Umbehr*, 518 U.S. 668, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996). If viewed as a failure to hire case, the denial of a sought-after position is also clearly an adverse action.

Plaintiff has successfully made out a prima facie case of discrimination in this case. The burden then shifts to defendant to articulate a legitimate, nondiscriminatory reason for its action. In this case, defendant has explained that it had an established policy of not permitting anybody

to coach two varsity sports with over-lapping seasons. Plaintiff, however, has provided sufficient evidence to raise an issue of fact that the defendant's articulated nondiscriminatory reason for its action was pretext for discrimination. Plaintiff, therefore, survives defendant's motion for summary judgment.

## CONCLUSION

For the reasons stated, defendant's motion for summary judgment is DENIED.