**Karen S. HOFFMAN, Plaintiff,**

v.

**SEBRO PLASTICS, INC., Defendant.**

**No. 99–CV–74330–DT.**

United States District Court,
E.D. Michigan,
Southern Division.

Aug. 16, 2000.

---

Janet M. Tooley, Detroit, MI, for plaintiff.

Stephen A. Lang, Livonia, MI, for defendant.

*OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

ROSEN, District Judge.

## I. INTRODUCTION

This Title VII/Elliott–Larsen sex discrimination/retaliation action is presently

before the Court on Defendant Sebro Plastics, Inc.'s Motion for Summary Judgment. Plaintiff has responded to Defendant's Motion, to which Response, Defendant has replied. (Both Plaintiff and Defendant also filed "supplemental" briefs.) Having reviewed and considered the parties' briefs and supporting documents, and having heard the oral arguments of counsel at the hearing held on June 22, 2000, the Court is now prepared to rule on this matter. This Opinion and Order sets forth the Court's ruling.

## II. PERTINENT FACTS

Plaintiff Karen Hoffman, is a 45–year–old white female employee of Defendant Sebro Plastics ("Sebro"). Ms. Hoffman began her tenure at Sebro in August 1987 as a molding machine operator [1] on the day shift at Sebro's Wixom, Michigan facility.[2]

After spending six years as a machine operator in the molding department at Sebro, in 1993, Ms. Hoffman requested and was granted a transfer to the position of inspector in the quality department. She subsequently requested and was granted reassignment to the molding department again as a machine operator. Then, in late 1994, Plaintiff learned of an assistant foreman position opening and submitted a request in writing to the plant manager that she be considered for that position. The position was not given to Plaintiff; it was given to a "new hire" male. Another assistant foreman position opened up shortly thereafter and Plaintiff again submitted a written request to be considered for the job. This time Plaintiff was given the position.

Contrary to what the job title implies, the assistant foreman's job is not a management position, as it is an hourly (as opposed to a salaried) position. Although Sebro does consider the position to be a "supervisory" one [see Defendant's Revised Responses to Plaintiff's First Interrogatories, Answer to Interrogatory No. 2 (Plaintiff's Ex. 1) ], it does not include the authority to hire, fire, discipline or assign job duties to other employees. Essentially, the assistant foreman's job is to assist the foreman changing molds, loading the machines, mixing colors, labeling products, assembling boxes for the finished products, performing final inspection on the parts, and cleaning the machine area.

Like the machine operator's position, the assistant foreman's job is an entry level job. Nonetheless, Sebro employees view the position as a higher level position than the operator's because it is not as monotonous as a machine operator's job, and presents a greater variety of work and more opportunity to learn. Thus, even though the pay rate is the same, the workers deem a move from the position of machine operator to assistant foreman to be a "promotion" [see, e.g., Deposition of Jeff Allsworth, p. 67], and the assistant foreman receives on-the-job training (by his/her foreman) that is necessary for a salaried foreman's position. See Depositions of Sebro foremen Eric Johnson (p. 13); Dave Cabot (pp. 19–21); and Jeff Allsworth (p. 40, 61–62).

Sebro is a non-union shop and seniority is given no consideration in promotion decisions. [See Employee Handbook, Section 2.01 (Defendant's Ex. 1).][3] Further,

---

1. Prior to working at Sebro, Ms. Hoffman worked as a machine operator at several other plastic fabricating facilities in the Wixom area. She also spent a number of years managing a dry cleaning franchise.

2. Sebro also operates a facility in Clinton Township, Michigan.

3. The Handbook sets forth Sebro's general employment policies. Specifically, Section 2.01 states:

Employment decisions involving Employees of the Company, such as hiring, promotion, demotion, transfer, selection for training, recruitment, separation, layoff, termination, rate of pay, benefits or other forms of compensation, will be made on the basis of individual merit, skill and qualification. Consequently, in making employment decisions, the Company will consider both objective and subjective factors such as education, training, skills developed, prior job

Sebro does not have any formal way of notifying employees of position openings or promotional opportunities. Occasionally, a notice of an open hourly position is posted on a bulletin board. More often than not, however, the only notification is "word of mouth."[4] Plant Manager Paul Butkovich testified that Sebro has never posted openings for salaried foreman positions. [Butkovich Dep. p. 14.]

Butkovich further testified that there is no evaluative process where people are invited to interview or submit resumes or the like. *Id.* at p. 16. He testified that all that he would normally do is talk to the supervisor or supervisors in the area who are familiar with the job and ask for feedback as to the performance of different employees *Id.* Based upon such recommendations, Butkovich would decide which employees to consider to fill vacancies and ultimately to whom a position would be offered. *Id.* Sometimes, as was the case with Plaintiff's 1995 "promotion" to assistant foreman, an employee will learn "through the grapevine" of an anticipated opening and submit a written request to be considered for the position.

Plaintiff's promotion to assistant foreman was actually somewhat of a ground breaking accomplishment because prior to January 1995 when Plaintiff was given the assistant foreman's position, there were no women assistant foremen at Sebro (nor were any employed as foremen).

Defendant does not dispute that Sebro's production operation is substantially sexually-segregated—management is exclusively male while the hourly production staff is overwhelmingly female. All of the machine operators/production workers in the molding department in 1995 were women.[5] (Even today, the molding machine operators are mostly women. According to Defendant's counsel, at present, 90% of the machine operators in molding and 75% of the production workers in assembly are women.)[6]

There are 11 foremen, six at the Wixom facility and five at the Clinton facility. All of the foremen are men. [*See* Defendant's Revised Answers to Plaintiff's Interrogatories, Answers to Interrogatories 3 and 4 (Plaintiff's Ex. 1).]

As for the intermediate level position of "assistant foreman," as of January 1999, there were 24 assistant foremen of which 5 were women. Plaintiff was the first female to be employed as an assistant foreman. *Id.* (From 1995 through January 1999, five more women were "promoted" from machine operator positions to assistant foreman positions.) Further, although the Company deems both the machine operator's and assistant foreman's position to be "entry level" jobs, Sebro's hiring history with regard to "new hires" reveals that very few women have ever been hired directly into the position of assistant foreman. Since 1996, Sebro has hired assistant foremen as "new hires" (as opposed to within company transfers or "promotions"). Of these 31 new hires assistant foremen, 26 have been men. Plant Manager Paul Butkovich testified that no one has ever become a foreman who had not already been an assistant foreman at

experience, prior job performance, attitude, ability to work with others, leadership and potential for growth in the job. [Defendant's Ex. 1, p. 1.]

4. The record evidence in this case is that of 37 assistant foreman positions filled since 1995, only one opening was posted. *See* Defendant's Revised Answers to Plaintiff's Interrogatories, Answer to Interrogatory No. 4.

5. Sebro's production operation is divided into departments—molding, assembly, quality, and shipping and maintenance, sales., engineering and administration. *See* Defendant's Revised Answers to Plaintiff's Interrogatories, Answer No. 2 (Plaintiff's Ex. 1.). Only the first three—molding assembly and quality—are involved in production.

6. Indeed, there is such a correlation between the molding machine operator position and gender that the machine operators at Sebro are referred to as "the ladies."

Sebro. Butkovich Dep. p. 13. *See also,* Deposition of Dave Cabot, p. 16.

Plaintiff assumed the assistant foreman position in early 1995. According to the foremen she worked under, Ms. Hoffman was hard-working and a good steady assistant foreman. *See* Cabot Dep. p. 44; Allsworth Dep. pp. 42–44; 71–72. She often worked overtime, and in so doing, frequently filled in for absent foremen.

After working in her position as an assistant foreman for nearly four years, during the Christmas holidays in 1998, Ms. Hoffman learned from Chuck Smith, the midnight shift foreman, that he had been offered a position as a day shift Quality Manager (in the quality department).

Smith (who, coincidentally is Plaintiff Karen Hoffman's nephew) testified that he was approached about taking the position by Plant Manager Paul Butkovich a day or two before the plant's holiday shut down in late December 1995 as he was preparing to leave after the end of his shift. [Chuck Smith Dep. pp. 11–12.] Smith testified that he told Butkovich that he would like to think about the offer and Butkovich told him to take the Christmas break to think about it and let him know when they came back to work after the holidays. *Id.* at p. 12. However, Butkovich told Smith to keep quiet and "not to spread it around the job" that he had been offered the quality position until he had made a final decision. *Id.* at pp. 12–13, 22.

Smith testified that he did think about the offer over the holidays and told his family (including Plaintiff) at Christmas Eve dinner that he had been offered the Quality Manager position but was still not absolutely sure whether or not to take the job. *Id.* at 14. He further testified that, although he had not had any discussion with Ms. Hoffman about the midnight foreman vacancy that would be created if he took the Quality Manager position, he knew she would be very interested in that slot. *Id.* He also said he told her on Christmas Eve to keep quiet about the offer. *Id.* at 22.

Plaintiff testified that Smith told her on January 6, 1999 that he had decided to take the Quality Manager position but that he was not going to see Paul Butkovich to tell him until January 8th. (Smith testified that he met with Butkovich some time during the first week after the holiday explaining that somedays he does not see Butkovich at all because they are on different shifts. *Id.* at 13.)

Plaintiff testified that she did not do anything about requesting the midnight shift foreman's job until January 8th since that is when Smith said he was going to tell Butkovich that he was accepting the quality position. On the morning of January 8th, Plaintiff submitted to the personnel manager a written request that the Company consider her for the midnight shift foreman's position. [*See* Plaintiff's Ex. 10.] Later that afternoon, however, Paul Butkovich announced that he had decided to give the midnight shift foreman's position to Eric Johnson, who had been employed with the company for 4½ years as an assistant foreman. [*See* Plaintiff's Ex. 9. *See also,* Plaintiff's Dep. pp. 187.]

Butkovich's January 8, 1999 announcement of Johnson's promotion to foreman stated as follows:

> Eric Johnson will begin training as 3rd shift Molding Foreman. He will assume responsibility for that position in early spring.
>
> ... Eric ha[s] much to learn in [his] new job[ ] Please give [him] your support and encouragement. Thank you.

[Plaintiff's Ex. 9.]

Johnson was throughout his tenure assigned to the midnight shift. Defendant's stated reason for giving Johnson the promotion instead of Plaintiff that "he was already working the third/midnight shift," while Plaintiff worked the day shift, and "[h]aving already worked the third shift, Johnson was familiar with its policies and procedures, was familiar with startup operations ... and had filled in for the fore-

man when necessary." [*See* Defendant's Brief in Support of Motion for Summary Judgment, p. 12.] Plaintiff also testified that she was told that "the reason they were giving Eric the job was because he was already on midnights and already knew the people." [Plaintiff's Dep. p 188.]

Upon learning of Eric Johnson's promotion to foreman, Plaintiff filed an internal company complaint of gender discrimination. On January 12, 1999, Plant Manager Paul Butkovich, Company President Tom Patterson and Plaintiff's day shift foreman, Dave Cabot met with Plaintiff to discuss her complaint. Plaintiff testified that she told these managers why she believed she had all the qualifications (and more qualifications than Eric Johnson) for the foreman's position and asked that they "at least give her a chance at the job." She said that Paul Butkovich told her they had already made their choice and no matter who they picked, somebody would be mad. [Plaintiff's Dep. pp. 239–40.] She said that Patterson then offered to send her for off-site training (training which Plaintiff had already had). She responded, "It sounds to me like you want me to have twice the training that it would take a young man to have the same job," to which Paul Butkovich retorted, "Well, Karen, we all know that you're doing a man's job." *Id.* at 239.[7]

After the meeting Patterson prepared a file memo memorializing the meeting, in which he stated:

> Tom Patterson advised that Karen, along with other employees, were considered and we concluded Eric Johnson was the most qualified. Karen said she should have been chosen for the job of 3rd Shift Molding Foreman due to her plant seniority and experience in different jobs.
>
> Various factors went into this decision including current shift assignment and technical skill. Tom explained to Karen, gender was not a factor. We made a decision that was in the best interest of Sebro. She left the meeting and Tom asked Dave Cabot, if he were picking the 3rd Shift Foreman who would he take, and he said Eric Johnson because Karen Hoffman lacked technical ability. (Note: Chuck Smith and Mike Green also recommended Eric Johnson.)[8]

[Plaintiff's Ex. 12.]

Plaintiff subsequently filed an EEOC charge of discrimination on January 28,

---

**7.** Nonetheless, Defendant acknowledges that Plaintiff readily accepted the offer of additional training. [*See* Ex. 12. *See also* Cabot Dep. pp. 63–64.]

**8.** Chuck Smith and Mike Green testified, however, that they were not asked about Karen Johnson; rather they were only asked about Eric Johnson. [*See* Smith Dep. p. 16, 18–19.] Smith further testified that he was only asked about Johnson's performance in general terms, such as "how [is] Eric doing?" *Id.* at 16. Smith was not asked about Johnson's supervisory potential. *Id.*

Dave Cabot testified that the basis for his statement that Karen Hoffman "lacked technical ability" was not meant to indicate that Ms. Hoffman was incapable of performing technical tasks but rather was meant only to indicate that he thought she needed "some more hands on training.". [Cabot Dep. p. 17, 19, 59.] That training, Cabot admitted, was something he, as Plaintiff's foreman, would have been responsible for. *Id.* (All of the foremen who were deposed testified that assistant foremen received the training needed to be a foremen on-the-job from the foremen they worked for.)

Cabot further testified that he had contemplated that another one of his assistants, Eric Mann, would be the next person promoted to foreman and that therefore, he, Cabot, "had given him a lot of training." *Id.* at 19–23. But Mann quit the company. *Id.* p. 19. Cabot admitted that he "hadn't given [Plaintiff] as much training as he had given Eric Mann." *Id.*

Mann quit in August of 1998. [*See* Plaintiff's Ex. 8.] Cabot testified that after Mann quit, he approached Karen Hoffman and told her that since Mann had quit "we're going to need somebody to step up and learn some more and ... try to fill some shoes around the shop" and asked her if she was interested. [*See* Cabot Dep. p. 24.] Cabot testified that Plaintiff said "yes." *Id.* It was shortly thereafter that Paul Butkovich approached him

1999 alleging that she was not promoted to midnight shift foreman because of her sex. [*See* Defendant's Ex. 6.] Since filing that charge, Plaintiff claims that she has been retaliated against by Sebro. Specifically, Plaintiff alleges that she has been denied the training which had been offered to her on January 12. Plant Manager Paul Butkovich admitted in his deposition that Plaintiff had not been offered such training. [Butkovich Dep. p. 39. *See also,* Plaintiff's Dep. pp. 213–215.] She also claims that she has been denied overtime work and shift coverage opportunities. While Defendant has presented evidence establishing that overtime has not been required as much as it has in the past, and that Plaintiff has, nonetheless, logged more overtime hours in 1999 than any other first shift assistant foreman [*see* Affidavit of Sebro Office Manager Roxanne Barnes, Defendant's Ex. 4], Defendant has not disputed Plaintiff's deposition testimony that "shift coverage" (i.e., filling in for absent foremen) opportunities have not been offered to her but instead, have been given to newer assistant foremen even though she is the senior or first assistant foreman on first shift. [*See* Plaintiff's Ex. 13.]

With respect to shift coverage, it is undisputed that Dave Cabot offered Plaintiff the opportunity to cover for absent foremen in May 1999, but that he told her she would have to (1) change her attitude and (2) stop her complaints. It is further undisputed that Plaintiff, contending that her attitude did not need changing, and that she "was not going to kiss anybody's ass to get a job," declined the shift coverage offer.

However, when Cabot informed Plant Manager Paul Butkovich that Plaintiff had turned down the shift coverage offer, he directed Cabot to have Plaintiff sign a memo indicating that she had refused a job assignment. [*See* Butkovich Dep. pp. 41–44.] Although Mr. Butkovich treated Plaintiff's refusal as an insubordinate act [*see* Butkovich Dep. p. 40], he admitted that Sebro employees could, without repercussion, turn down job assignments that are not routine duties of their regular job. *Id.* Dave Cabot admitted that, notwithstanding that he had signed a document [Cabot Deposition Ex. 6] indicating that Plaintiff had "refused a job assignment", Plaintiff had merely declined "an offer," which she had the option of doing without repercussion. Cabot Dep. pp. 72–74.

The following day, May 12, 1999, Tom Patterson, Paul Butkovich and Dave Cabot conducted another meeting with Plaintiff to discuss her having declined Cabot's offer to her to cover for absent foremen which Patterson characterized as a meeting to discuss Ms. Hoffman's "refusal of job assignment." [*See* Cabot Deposition Exhibit 6]. At this meeting, Tom Patterson, company president, advised Plaintiff that she had to change her attitude or she would be terminated. *Id. See also,* Butkovich Dep. p. 44; Cabot Dep. p. 70.

On June 16, 1999, the EEOC issued its Right to Sue Notice to Plaintiff concerning her January 28, 1999 charge of sex discrimination. On September 2, 1999, Plaintiff timely filed the instant action.

In her four-count Complaint, Plaintiff alleges claims of sex discrimination under both Title VII and the Michigan Elliott–Larsen Civil Rights Act based upon the January 8, 1999 denial of promotion. She also alleges claims of retaliation for having filed her EEOC charge under both the federal and state statute based upon the denial of training, overtime and shift cov-

with the question of whether he thought Ms. Hoffman or Eric Johnson should be promoted to foreman. *Id.* Cabot further testified that he made no recommendation about Eric Johnson; that when Paul Butkovich asked him whether he thought Eric Johnson was foreman material he told Butkovich that he could

not speak to his qualifications and told Butkovich to talk to his (Johnson's) foreman, Chuck Smith. *Id.* at pp. 17, 19. Cabot specifically denied every having told Butkovich that he thought Eric Johnson had better technical skills or better trouble shooting capability than Plaintiff. *Id.* at 61.

erage assignments, and the write-up and threat of termination concerning her refusal of Dave Cabot's May 11, 1999 offer to designate her to fill-in for vacationing foremen.

Defendant now seeks entry of summary judgment in its favor and dismissal of Plaintiff's Complaint in its entirety.

### III. DISCUSSION

### A. STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper " 'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " Fed. R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[9] According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

After reviewing the above trilogy, the Sixth Circuit established a series of princi-

ples to be applied to motions for summary judgment. They are summarized as follows:

> \* Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

> \* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

> \* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

> \* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

> \* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Betkerur v. Aultman Hospital Association,* 78 F.3d 1079, 1087 (6th Cir.1996). *See also, Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir.1989). The Court will apply the foregoing standards in deciding Defendant's Motion for Summary Judgment in this case.

---

**9.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful tri-

als." 10A Charles A. Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice & Procedure,* § 2727, at 35 (1996 Supp.).

## B. PLAINTIFF HAS MADE OUT A PRIMA FACIE CLAIM OF DISCRIMINATION

It is well-established that the burden is on an employment discrimination plaintiff—under both federal and Michigan law—to establish a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Carden v. General Motors,* 156 Mich.App. 202, 210, 401 N.W.2d 273 (1986), *lv. den.,* 428 Mich. 891, 403 N.W.2d 811 (1987).

■ A Title VII plaintiff may establish a *prima facie* case of discrimination either by presenting direct evidence of intentional discrimination by the defendant, *Terbovitz v. Fiscal Court,* 825 F.2d 111, 114–15 (6th Cir.1987) (citing *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 621–22, 83 L.Ed.2d 523 (1985)), or by showing the existence of circumstantial evidence which creates an inference of discrimination, *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. *See Talley v. Bravo Pitino Restaurant, Ltd.* 61 F.3d 1241, 1246 (6th Cir.1995). Similarly, under Michigan's Elliott–Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq.,* an employment discrimination plaintiff can establish her *prima facie* case by proving either (1) that she was accorded disparate treatment because of her membership in a protected class or (2) that her employer engaged in intentional discrimination. *Wyatt v. Southland Corporation,* 162 Mich.App. 372, 374–375, 412 N.W.2d 293 (1987); *Dixon v. W.W. Grainger, Inc.,* 168 Mich.App. 107, 114, 423 N.W.2d 580 (1987).

Plaintiff here has presented her claims of sex discrimination both as claims of intentional discrimination and as disparate treatment claims under the *McDonnell Douglas* paradigm.

## 1. INTENTIONAL DISCRIMINATION

■ Plaintiff contends that an inference of intentional discrimination can be drawn from the totality of the evidence of: (1) the gender-segregated nature of Defendant's workforce, (2) the company's general hiring and promotion practices (3) the accepted reference to molding machine operators as "the ladies," and (4) Mr. Butkovich's statement when he met with her on January 12, 1999 that a foreman's position is "a man's job."

Defendant argues that the foregoing "circumstantial" evidence cannot be used by Plaintiff to establish a claim of intentional discrimination. Defendant contends that in the Sixth Circuit, circumstantial evidence cannot be used to establish intentional discrimination; that only "direct" evidence can be used. In support of this contention, Defendant points to, *Terbovitz v. Fiscal Court,* 825 F.2d 111 (6th Cir. 1987), and *Blalock v. Metals Trades, Inc.,* 775 F.2d 703 (6th Cir.1985).

In *Terbovitz,* the court, quoting *Blalock, supra,* stated as follows with respect to establishing a claim of intentional discrimination and "direct evidence":

The *McDonnell Douglas* formula is inapplicable ... to cases in which the Title VII plaintiff presents **credible, direct evidence** of discriminatory animus. (Citations omitted). "Direct evidence and the *McDonnell Douglas* formulation are simply different evidentiary paths by which to resolve the ultimate issue of defendants' discriminatory intent." [*Blalock, supra.*] Direct evidence of discrimination, if credited by the fact finder, removes the case from *McDonnell Douglas* because the plaintiff no longer needs the inference of discrimination that arises from the prima facie case. Upon crediting the plaintiff's direct evidence, the district court finds facts requiring the conclusion that unlawful discrimination was at least a "motivating factor" for the employer's actions. *See id.* at 707–10. The existence of unlawful discrimination is patent, and if the em-

ployer does not propose an alternative explanation for its actions, Title VII liability will automatically follow.

If the employer does assert an alternative justification for its employment action however, it will be arguing, either explicitly or by implication, that although discriminatory motivation may have entered into its employment decision, the same decision would have been made regardless of the discrimination. At this point, the case becomes a "dual motive" or "mixed motive" case, and the crucial issue becomes one of causation (Citation omitted.) However, because discrimination has already been established by the plaintiff's direct evidence, the employer must do more than merely "articulate" its nondiscriminatory justification as required under *McDonnell Douglas*. See *Blalock*, 775 F.2d at 710. In *Blalock* we adopted the causation standard of *Mt. Healthy City School Dist. Board of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), under which the burden shifts to the employer to prove by a preponderance of the evidence "that the adverse employment action would have been taken even in the absence of the impermissible motivation." *Blalock*, 775 F.2d at 712. Thus, once the district court accepts the plaintiff's direct evidence, the employer's asserted nondiscriminatory reason for its action, which must merely be "articulated" under *McDonnell Douglas*, effectively becomes an affirmative defense on which the employer bears the burden of proof.[10]

825 F.2d at 114–15 (emphasis added). *See also, Blalock, supra*, 775 at 707, "Where the evidence for a *prima facie* case consists of **direct testimony** that the defendants acted with a discriminatory motivation [with respect to the specific adverse employment action at issue], if the trier of fact believes the *prima facie* evidence the

ultimate issue of discrimination is proved; no inference is required." *Id.*

From the phrases "credible, direct evidence" and "direct testimony" in the above-quoted excerpts, Defendant extrapolates that "circumstantial" evidence may not be used in the Sixth Circuit to establish a claim of intentional discrimination.

The Court acknowledges that there is some support in Sixth Circuit case law for Defendant's contention. For example, in *Blalock*, a direct evidence discrimination case, the court stated as follows:

> This distinction between direct and circumstantial evidence raises the issue of what constitutes "direct" evidence. *Dybczak v. Tuskegee Institute*, 737 F.2d 1524, 1528 (11th Cir.1984), *cert. denied*, 469 U.S. 1211, 105 S.Ct. 1180, 84 L.Ed.2d 328 (1985) (**statistics are not direct evidence**); *Johnson v. Allyn & Bacon, Inc.*, 731 F.2d 64, 69 n. 6 (1st Cir.), *cert. denied*, 469 U.S. 1018, 105 S.Ct. 433, 83 L.Ed.2d 359 (1984) (**statistical evidence is circumstantial**); *Clay v. Hyatt Regency Hotel*, 724 F.2d 721, 724 (8th Cir.1984).

*Blalock*, 775 F.2d at 707 (emphasis added).

*Blalock* and *Terbovitz*, however, are relatively old cases that date back to when Title VII cases were tried without a jury and no Sixth Circuit case has addressed this issue since the 1991 amendments to Title VII which provided for jury trials. More recent Sixth Circuit decisions do not appear to take such a narrow view as to what constitutes "direct evidence" of discrimination. For example, in *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1248–49 (6th Cir.1995), relying upon *Blalock*, the defendant argued that plaintiff presented no "direct evidence" that his termination was racially motivated. In that case, the plaintiff, a fired black restaurant employee, relied upon evidence which consisted of his own affidavit and

---

10. The *Terbovitz* court further held that evidence which would support a finding of pretext under the *McDonnell Douglas* formula would also support a finding that the defen-dant failed in its burden of proving that the same decision would have been made regardless of the discriminatory motivation. 825 F.2d at 115, quoting *Blalock*, at 712.

the affidavits of two witnesses—a restaurant valet and the lunch manager—in which the affiants stated that the owners had occasionally made racial slurs, and disparaging and comments about blacks. The Sixth Circuit held that these affidavits concerning racist comments constituted " 'direct evidence' that plaintiff's termination may have been racially motivated." 61 F.3d at 1249. Therefore, the court determined that summary judgment on the plaintiff's intentional discrimination claim was improper. *Id.* at 1250.

In reaching the conclusion that evidence of a manager's racist comments constitutes "direct evidence" of discrimination, the court expressly adopted the reasoning of two cases from the Eleventh Circuit, *Miles v. M.N.C. Corp.,* 750 F.2d 867, 875–76 (11th Cir.1985), and *Lee v. Russell County Bd. of Educ.,* 684 F.2d 769, 774 (11th Cir. 1982). *See Talley,* 61 F.3d at 1249. In *Miles,* the court held that racial slurs made by a manager were direct evidence of discrimination sufficient to get the plaintiff's case to the jury. 750 F.2d at 870. In *Lee,* the court concluded that statements by a principal about his concern that a "white presence" be maintained among the faculty at a newly integrated school in order to avoid "white flight" constituted direct evidence that the school board acted with a discriminatory motivation in firing a black teacher. 684 F.2d at 774–75.

The *Talley* court explained:

This case is similar to *Miles* and *Lee* insofar as plaintiff presented evidence that both Mr. DiRaimo and Mr. Pitino had made racist comments which constitute direct evidence that plaintiff's termination may have been racially motivated. Therefore, following *Miles* and *Lee,* both of which were cited with approval in *Blalock,* 775 F.2d at 707, we conclude that defendant's argument that plaintiff presented no direct evidence of discrimination is without merit. *See also Sennello v. Reserve Life Ins. Co.,* 872 F.2d 393, 395 (11th Cir.1989) (concluding that certain statements by a manager were direct evidence of discriminatory motivation in an employment decision).

61 F.3d at 1248–49.

Clearly, the affidavit evidence relied upon by the plaintiff in *Talley* was not "direct" evidence in the evidentiary sense of direct evidence. True direct evidence would be the actual statements of the managers that they were firing Talley because he is black.[11] *See also, Jacklyn v. Schering–Plough Healthcare Prod. Sales Corp.,* 176 F.3d 921, 926 (6th Cir.1999) ("In discrimination cases, direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.")[12]

**11.** *Compare, Blalock,* where the evidence was a letter written by the religious discrimination plaintiff's employer in which the employer stated as follows:

Larry was hired with the full knowledge and understanding that Metals Trades is a Christian Company and our rule book is the word of God, or the Bible. He was in full accord and very excited. He said he wanted to work for a Christian Company and being a salesman contacting new accounts he wanted to witness to them; in which I encouraged him. Larry is a fine young man and he has my respect in may areas. I hated to lay him off as there are too few men willing to commit themselves to Jesus—especially salesmen. Larry's problem is that he refuses to submit himself to those in authority over him and the Bible makes

it clear that we are to be in submission. Larry was let go for strictly secular reasons but the root of his problem is spiritual as the scriptures will show....

775 F.2d at 705–06.

**12.** *But see, Norbuta v. Loctite Corp.,* No. 98–3013, 1999 WL 357780 (6th Cir.1999) (unpublished opinion; text available on WESTLAW), in which the court stated:

Direct evidence proves the existence of a fact **without any inferences** or presumptions.... The plaintiff must present ... evidence which would allow us to find intentional discrimination on the part of the defendant **without making inferences.**

1999 WL 357780, at *1, citing *Manzer v. Diamond Shamrock Chemicals Co.,* 29 F.3d 1078, 1081 (6th Cir.1994) (emphasis added).

As the foregoing cases demonstrate, the issue of what constitutes "direct evidence" of discrimination has created a degree of confusion in the courts. The Eleventh Circuit recently recognized this confusion in *Wright v. Southland Corporation,* 187 F.3d 1287 (11th Cir.1999). In *Wright,* the court noted that "substantial confusion" has been created by the "indiscriminate use of the term 'direct evidence'" in employment discrimination cases. Therefore, the court took on the exhaustive task of parsing through the case law to come up with a workable definition. The court explained:

> The importance of properly defining "direct evidence" arises from our repeated statements that when a plaintiff has direct evidence of illegal discrimination, he need not make use of the *McDonnell Douglas* presumption, and conversely, when he does not have such direct evidence, he is required to rely on the *McDonnell Douglas* presumption. In other words, a plaintiff in an employment discrimination suit may proceed by one of two means: (1) *McDonnell Douglas,* or (2) direct evidence. [T]he *McDonnell Douglas* presumption is

merely an evidence-producing mechanism that can aid the plaintiff in his ultimate task of proving illegal discrimination by a preponderance of the evidence. Consequently, if "direct evidence" is the alternative to using *McDonnell Douglas,* the term would seem necessarily to mean evidence sufficient to prove, without benefit of the *McDonnell Douglas* presumption, that the defendant's decision was more probably than not based on illegal discrimination.

187 F.3d at 1293 (citations omitted).

As the *Wright* court noted, however, the term "direct evidence" has a particular meaning in the law of evidence:

> The problem, however, is that "direct evidence" has a well-established meaning in the law of evidence as evidence, which if believed, proves existence of fact in issue without inference or presumption. *Black's Law Dictionary,* 460 (6th ed 1990). For instance, in a murder prosecution, the prosecutor must establish the fact that the defendant killed the victim. A witness who testifies that she saw the defendant kill the victim has provided direct evidence of this fact; if

Notwithstanding the fact *Norbuta,* being an unpublished decision, is not binding upon this court, the *Norbuta* court's definition is questionable in that it misconstrues *Manzer*'s ruling on the direct evidence issue.

The cited portion of *Manzer* states as follows:

> An ADEA plaintiff's case is submissible if it presents direct evidence that the defendant fired the plaintiff because of his age. In such cases, provided that the jury believes plaintiff's evidence, the burden of persuasion shifts to the employer to prove that it would have terminated the plaintiff even had it not been motivated by age discrimination. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 244–45, 109 S.Ct. 1775, 1787–88, 104 L.Ed.2d 268 (1989) (plurality opinion). Manzer contends that he presented direct evidence of age discrimination and, therefore, the burden of persuasion should have shifted to Diamond Shamrock.
>
> On cross-examination, Manzer elicited the following testimony from John McConnell, Manzer's supervisor at the time Manzer was fired:

> Q. Had Edwin Manzer been 55 [years old], you wouldn't have had to terminate him, would you?
> A. If Ed Manzer had been 55, he would have been offered the same program, I presume, of voluntarily [sic] retirement, early retirement. I presume he would have been included in that group, if he had been 55. This is not direct evidence of age discrimination. It is merely a statement of fact that, had Manzer been older, he would have qualified for the same benefits as others. The relevance of this statement to Manzer's case, if any, is provided by inference. **Manzer would have the jury infer from the "timing" of his termination that not only was age the motivating factor in terminating him but also that his imminent qualification for additional benefits forced the company to terminate him before he got any older.** Because this evidence is, at most, circumstantial evidence of discrimination, *Price Waterhouse* is not applicable.
> 29 F.3d at 1081 (emphasis added).

the jury believes the witness' testimony, then the fact that the defendant killed the victim has been proven. Direct evidence is the opposite of "circumstantial" (or "indirect") evidence, which is "[e]vidence of facts or circumstances from which the existence of facts in issue may be inferred." *Id.* at 243. Returning to the murder hypothetical, a witness who testifies that she saw the defendant enter the victim's home and exit three minutes later with blood on his hands has provided circumstantial evidence that the defendant killed the victim; the jury could reasonably infer from this evidence (combined with other circumstantial evidence) that the defendant killed the victim....

*Id.* at 1293–94.

Thus, as the court in *Wright* observed, we are presented with two possible definitions of "direct evidence":

The first is the one that follows logically from the structure of employment discrimination law—namely, evidence from which a reasonable factfinder could find, by a preponderance of the evidence, a causal link between an adverse employment action and a protected personal characteristic [referred to as the "preponderance" definition]. The second is the traditional definition from the law of evidence—namely, evidence that, if believed, proves the existence of a fact in issue without inference or presumption [referred to as the "dictionary" definition].

*Id.* at 1294.

The *Wright* court then proceeded to explain what kind of evidence would constitute "direct evidence" of discrimination under the dictionary definition:

As an initial matter it is important to clarify what would constitute direct evidence of illegal discrimination under the dictionary definition. Illegal discrimination means that the adverse employment action of which the plaintiff complains was based (at least in part) on an impermissible criterion, such as race, sex, or age. Thus, relevant evidence for proving illegal discrimination is evidence that demonstrates the state of mind of the employer (or, more concretely, the decisionmaker) at the time of the employment decision. The only "eyewitness" to the state of mind of the decisionmaker is the decisionmaker himself. Consequently, the only direct evidence of illegal discrimination under the dictionary definition would be testimony from the decisionmaker that he took an adverse employment action against the plaintiff on the basis of a protected personal characteristic. Any other form of evidence requires at least on inference to reach the conclusion that the employer has impermissibly discrimination.

*Id.* at 1294–95.

The court then proceeded to examine cases in which the courts had held that the plaintiff presented "direct evidence" of discrimination and observed that in each of the cases, numerous inferences—"reasonable inferences but inferences, nonetheless"—were required to move from the plaintiff's evidence to the conclusion that the defendant relied upon a protected personal characteristic in deciding to take an adverse employment action against the plaintiff. *Id.* at 1295. *See e.g., Taylor v. Runyon,* 175 F.3d 861 (11th Cir.1999), (plaintiff's testimony that the decisionmaker told her that the male co-worker with whom she was competing for a promotion was promoted instead of her because he had a wife and children and therefore needed more money constituted "direct evidence" of sex discrimination); *Caban–Wheeler v. Elsea,* 904 F.2d 1549 (11th Cir. 1990) (Hispanic plaintiff's testimony that her employer told her that he "needed a black director" held to constitute direct evidence that plaintiff was terminated because of her race); *Buckley v. Hospital Corp. of America,* 758 F.2d 1525 (11th Cir.1985) (holding that the following testimony, as a whole, constituted direct evidence that the plaintiff was terminated because of her age: that the decisionmak-

er expressed surprise upon discovering the substantial length of time some of his employees had been working at the hospital; that the decisionmaker once attributed plaintiff's loss of temper to her age; that the decisionmaker stated that he intended to recruit younger doctors and nurses; and that the decisionmaker felt that the hospital needed "new blood"); *Lee v. Russell County Board of Education, supra* (school official's statement that he was concerned about getting a greater "white presence" in a recently desegregated school and one school board member's statement that he was pleased that a newly hired teacher was white held to constitute direct evidence that minority teachers were terminated because of their race).

As the *Wright* court observed, numerous inferences were required in each of these cases to establish that the defendant-decisionmakers relied upon a protected characteristic in deciding to take the adverse employment actions against the plaintiffs. In *Taylor*, the trier of fact was required "to infer that the decisionmaker's beliefs regarding the male employees greater need for income were based on a sexual stereotype Then, having made that inference, the trier of fact would then need to have inferred that this sexual stereotype was the cause of the defendant's refusal to give the plaintiff the desired promotion." 187 F.3d at 1295.

In *Caban–Wheeler*, the plaintiff's evidence (that the employer had said "he needed a black director") involved the testimony of someone other than the employer. It also required the inference that decisionmaker's felt need for a black director was the reason for the Hispanic plaintiff's discharge. As the *Wright* court observed, the trier of fact could have concluded from this inference that the plaintiff was fired because of her race. However, "the trier of fact alternatively could have concluded that the decisionmaker wanted a black director but fired the plaintiff for a different reason, totally unrelated to his desire for a black director." *Id.* at 1296.

The plaintiff's testimony was "direct evidence" of discrimination only under the "preponderance" definition—"the employer's statement could have led a trier of fact to reasonably conclude that the employer more probably than not fired the plaintiff because of her race." *Id.*

Similarly, none of the evidence relied upon by the nurse-plaintiff in *Buckley* "even resembled a statement by the decisionmaker that the plaintiff was fired because of her age—the first two statements (about the decisionmaker's surprise at the length of time some employees had worked at the hospital and about the decisionmaker once attributing the plaintiff's temper outburst to her age) tended to prove that the decisionmaker held certain aegist stereotypes; the second two statements reflected a generalized *ex ante* desire for younger employees." *Id.* As the *Wright* court observed, "[N]one of these statements tied these facts to the particular employment decision at issue. The evidence was, however, powerful circumstantial evidence from which a trier of fact could have concluded that the decisionmaker more probably than not fired the plaintiff because of her age." *Id.*

The same is true of the "white presence"/"white flight" statements in *Lee*. None of the school board members testified that race played any role in their decision to fire the plaintiff. Furthermore, there was no evidence linking the school official's and individual board members general racial sentiments to the employment decision at issue. As the *Wright* court observed, the holding in *Lee* that the plaintiff had presented direct evidence of discrimination "makes sense only if the preponderance definition of direct evidence is used." *Id.* at 1297.

Based upon the examination of the foregoing cases, and others, the Eleventh Circuit concluded that, " 'direct evidence' in the context of employment discrimination law means evidence from which a reasonable trier of fact could find more probably than not, a causal link between an adverse

employment action and a protected personal characteristic." *Id.* at 1293.

Decisions from other circuits are consistent with the determination that purely circumstantial evidence from which the trier of fact could infer that illegal discrimination played a role in an adverse employment decision can constitute "direct evidence" in the employment discrimination context. *See e.g., Fields v. Clark University*, 817 F.2d 931 (1st Cir.1987) (court determined that evidence (1) that the sociology department was all male and (2) that some members of the department had made sexual comments and innuendos was sufficient to establish a claim of discrimination through "direct evidence"); *Hopkins v. Price Waterhouse*, 825 F.2d 458 (D.C.Cir.1987), *rev'd on other grounds*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (evidence that plaintiff was only woman among 88 candidates for partner and that a few of the 32 partners asked to evaluate her candidacy commented that she was "too macho" and may be overcompensating for being a woman, "lacked social graces," "needed a course in charm school," and needed "to learn to walk more femininely, talk more femininely, and dress more femininely" found to constitute "direct evidence" of discrimination). *See also, Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716 (7th Cir.1998) (isolated comments made contemporaneously with the discharge or causally related to the discharge decision may constitute "direct evidence" of discrimination *Id.* at 723); *Karcher v. Emerson Electric Co.*, 94 F.3d 502, 507–8 (8th Cir.1996) (plaintiff had sufficiently made out a claim of intentional discrimination in her employer's failure to promote her from the inconsistent nature of the defendant's selection process and its failure to ever have selected any women or train women to meet the qualifications necessary for the promotion).

Just as the Eleventh Circuit found with respect to *Lee v. Russell County Board of Education*, the Sixth Circuit's decision in *Talley v. Bravo Pitino Restaurant, supra* "makes sense only if the preponderance definition of direct evidence is used." As noted above, in *Talley,* there was no evidence that the restaurant owner or the restaurant manager said that they fired Talley because he was black. Rather, the evidence which the Court of Appeals found sufficient for the case to have been submitted on a "direct evidence" theory consisted of the testimony of the plaintiff and two co-workers that the restaurant owner and manager had made racial slurs and derogatory statements concerning blacks. Thus, notwithstanding the Sixth Circuit's repeated quoting of the dictionary definition of direct evidence (i.e., that "direct evidence" is evidence which requires no inferences) it is clear that in application, the Court of Appeals has not taken such a rigid approach. Rather, as *Talley* demonstrates, the Court of Appeals has found purely circumstantial to constitute sufficient "direct" evidence of discrimination to entitle a plaintiff to have his or her case considered on a "direct evidence" theory, without having to resort to the *McDonnell Douglas* construct.

The Court further notes that the law makes no distinction between the weight to be given to direct and circumstantial evidence, and given that we now have jury trials in Title VII cases, in light of the foregoing discussion, the Court finds that Plaintiff Hoffman in this case has presented sufficient "direct" evidence of discrimination in the totality of the evidence of: (1) the gender-segregated nature of Defendant's workforce, (2) the company's general hiring and promotion practices, (3) the accepted reference to molding machine operators as "the ladies," and (4) Mr. Butkovich's alleged statement when he met with her on January 12, 1999 that the foreman's position which she wanted is "a man's job." Accordingly, the Court finds that Plaintiff has made out a sufficient *prima facie* claim of illegal intentional sex discrimination un-

der the "direct evidence" theory.[13]

## 2. DISPARATE TREATMENT UNDER McDONNELL DOUGLAS

Even if the Court were to find that Plaintiff had not presented sufficient direct evidence of discrimination to make out a claim of intentional discrimination, the Court finds that she has made out a *prima facie* case of discrimination using the *McDonnell Douglas* framework.

Under the *McDonnell Douglas* approach, an employment discrimination plaintiff establishes a *prima facie* claim by producing evidence (1) that she is a member of a protected group, (2) that she was subject to an adverse employment decision, (3) that she was qualified for the position, and (4) that similarly-situated non-protected employees were treated more favorably. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir.1992); *Talley v. Bravo Pitino Restaurant, Ltd.*, *supra*, 61 F.3d at 1246. *See also McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Chappell v. GTE Prods. Corp.*, 803 F.2d 261, 265 (6th Cir.1986), *cert. denied*, 480 U.S. 919, 107 S.Ct. 1375, 94 L.Ed.2d 690 (1987).[14]

Defendant here disputes only the satisfaction of the third and fourth elements. With respect to the third element—whether Plaintiff was "qualified"—Defendant argues that Plaintiff "fail[ed] to establish that her qualifications (for a promotion to foreman) were similar to the qualifications of non-protected class employees." [Defendant's Brief, p. 10.]

■ In its recent decision in *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660–66 (6th Cir.2000), the Sixth Circuit cautioned that the courts must not use the "qualified" element of the *prima facie* case to heighten the plaintiff's initial burden. In an effort to ensure that the first two stages of the *McDonnell Douglas* inquiry remain analytically distinct, and that a plaintiff's initial burden not be too onerous, *Cline* requires that the "qualified" prong of the *prima facie* case be evaluated in light of the plaintiff's employment record *"prior to* the onset of the events that the employer cites as its reason" for its decision. 206 F.3d at 662–3. Moreover, the Sixth Circuit instructed that the legitimate non-discriminatory reason offered by the employer at the second stage of the *McDonnell Douglas* inquiry may not be considered in determining whether the employee has produced sufficient evidence to establish a *prima facie* case. *Id.* at 660–1. Thus, assessing the plaintiff's qualifications by comparison to similarly-situated non-protected class employees is a matter reserved to the Defendant's "legitimate non-discriminatory reason" rebuttal. *Id.*[15]

**13.** In addition to alleging a violation of Title VII, Plaintiff has alleged a claim of intentional discrimination under the Michigan Elliott–Larsen Civil Rights Act. Under Elliott–Larsen, a plaintiff establishes a claim of intentional discrimination by showing (1) that she is a member of the affected class, (2) that adverse employment action was taken against her, (3) that the person responsible for this adverse action was predisposed to discriminate against persons in the affected class, and (4) that the person actually acted on this predisposition with respect to the plaintiff. *See, McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1161 (6th Cir.1990) (citing various Michigan cases). The Court finds that the totality of Plaintiff's evidence of the gender-segregated nature of Defendant's workforce, the company's general hiring and promotion practices, the accepted reference to molding machine operators as "the ladies," and Mr. Butkovich's statement when he met with her on January 12, 1999 after awarding Eric Johnson that the foreman's position which she was denied is "a man's job" to satisfy the requisites of a claim of intentional discrimination under Michigan law.

**14.** Michigan courts also utilize the *McDonnell Douglas* construct. *See, Dixon v. W.W. Grainger*, 168 Mich.App. 107, 423 N.W.2d 580 (1987); *Carden v. General Motors*, 156 Mich. App. 202, 401 N.W.2d 273 (1986), *lv. denied*, 428 Mich. 891, 403 N.W.2d 811 (1987).

**15.** As this Court recently noted in *Nizami v. Pfizer, Inc.*, 107 F.Supp.2d 791, —— n. 11, 2000 WL 1100010, n. 11 (E.D.Mich., July 31, 2000), the Court finds *Cline* to be problematic. The Court is concerned that *Cline* unduly places the initial burden on the defendant

Turning then to the fourth *McDonnell Douglas* element, i.e., whether similarly-situated non-protected class employees were treated more favorably, again Defendant presents arguments that belong in the rebuttal phase of the *McDonnell Douglas* paradigm. Defendant contends that Plaintiff has not established that she and Eric Johnson, the assistant foreman that was promoted to foreman, are not "similarly situated" because she has not established "that she was more qualified than Johnson" and because she worked for 5½ years on the day shift while Johnson was an assistant foreman on the midnight shift. [Defendant's Brief, p. 11.] Again, these are issues to be raised in rebuttal as legitimate non-discriminatory reasons. As the *Cline* court explained, "forcing plaintiffs to make such a proof at the prima facie stage defies the very purpose of the production stage and the overall sequence of *McDonnell Douglas*." 206 F.3d at 665. Requiring that these issues be raised at the rebuttal stage, "frame[s] the factual issue[s] with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." *Id.*[16]

For all of the foregoing reasons, the Court finds no merit in Defendant's "failure to establish a *prima facie* case" argument.

Once the plaintiff has established a *prima facie* case, which creates a presumption that the defendant unlawfully discriminated against the plaintiff, the burden of production shifts to the defendant to articulate a legitimate nondiscriminatory reason for the plaintiff's rejection. *Texas*

*Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254–56, 101 S.Ct. 1089, 1094–95, 67 L.Ed.2d 207 (1981); *Chappell,* 803 F.2d at 265. If the defendant offers a legitimate reason, the burden of production shifts back to the plaintiff to demonstrate that the legitimate reason offered by the defendant was not its true reason but were a pretext for discrimination. *Burdine, supra,* 450 U.S. at 253, 101 S.Ct. 1089; *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507–508, 113 S.Ct. 2742, 2747–48, 125 L.Ed.2d 407 (1993); *Reeves v. Sanderson Plumbing Products, Inc.,* —— U.S. ——, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000). The plaintiff may establish pretext by showing that the employer's proffered explanation is false or unworthy of credence. *Id.* at 2105, 2106.

■ As indicated above, Defendant's proferred non-discriminatory reasons for its decision not to promote Plaintiff to the position of midnight shift foreman were (1) Johnson "was already working the third/midnight shift" and therefore "was familiar with its policies and procedures, was familiar with startup procedures, . . . and had filled in for the foreman when necessary" and (2) that Johnson "was familiar with the individuals on the third/midnight shift and had supervised them in the past."

While familiarity with the midnight shift and its employees appears, on its face, to be a plausible explanation of why Sebro decided to give Eric Johnson the job rather than Plaintiff, who was an assistant

employer, not the plaintiff, in cases where the employer's non-discriminatory reason for acting happens to coincide with the "qualified" element of the *prima facie* case and seemingly precludes the employer in such a case from arguing in a motion for summary judgment that the employee has no evidence to sustain the "qualified" prong. Even where the "qualified" issue is straightforward—for example, in a case where an employer fails to promote an employee who lacks a necessary college degree—*Cline* prohibits any consideration of this issue at the *prima facie* stage, and requires that a court ask only whether the

employee was qualified for the position he held before seeking the promotion. Nonetheless, the Court recognizes that *Cline* is now the law of the Circuit, and it is bound to follow *Cline*'s ruling.

**16.** The Court has the same concerns with respect to the "similarly-situated" prong of the *McDonnell/Douglas* paradigm that it noted in footnote 10 with respect to *Cline*'s approach to the "qualified" prong. *See Nizami, supra,* 2000 WL 1100010, 107 F.Supp.2d at —— n. 11.

foreman on the day shift, the record evidence of this case establishes that the shift an assistant foreman worked never before played any part in a decision to promote an assistant to foreman. For example, Jeff Allsworth had been a day shift assistant; he went directly to midnights when promoted. Indeed, Ms. Hoffman's foreman, Dave Cabot went from afternoon assistant to midnight foreman. [Cabot Dep. p. 11–12.] Mike Green went from day assistant to afternoon foreman. [Green Dep. p. 23.] And, Andrew Herrada went from midnight assistant to foreman in the assembly department, a department in which he had never previously worked. Perhaps just as telling, Plaintiff, herself, had worked the midnight shift, both as an operator and as an assistant foreman working overtime.

Furthermore, Defendant admits that it has never promoted any women to a foreman's position. All of the foremen are men. Defendant's hiring history further demonstrates a pattern of sexual discrimination. Women are rarely hired into the company as assistant foremen; rather they are usually hired in as machine operators. In fact, all of the machine operators in the molding department are women. Further, until Plaintiff was "promoted" from machine operator to assistant foreman in 1995, there had never been a female assistant foreman.

Given the foregoing evidence, the Court finds that Plaintiff has sufficiently established that Defendant's proffered reason

for promoting Eric Johnson to midnight shift foreman instead of her because he was already an assistant foreman on the midnight shift, does not completely rebut Plaintiff's *prima facie* case.

Defendant also proffers as an additional "non-discriminatory" reason for not promoting Plaintiff: that Eric Johnson had better technical skills. However, as indicated above, Dave Cabot, Chuck Smith and Mike Green all testified that they were never asked to make a comparison of Plaintiff's and Eric Johnson's technical skills. Further, while Dave Cabot said that he thought Plaintiff needed more training, he admitted that he was the one responsible for that training and that while he had the opportunity to provide such training to Plaintiff, he instead chose to train her co-worker, Eric Mann. Other foremen that Plaintiff had occasion to work with testified that Plaintiff was a cooperative worker who was eager to learn and who had good technical skills [*see* Depositions of Jeff Allsworth and Mike Green]. Because no real comparison of Plaintiff's and Eric Johnson's technical skills ever seems to have been made, the Court finds that any attempt to justify as a matter of law the promotion of Eric Johnson over Plaintiff based on their relative technical skills lacks support in the evidentiary record.[17]

For all of these reasons, Defendant's Motion for Summary Judgment on Plaintiff's claims of sex discrimination will be denied.[18]

17. Defendant has presented with its Reply Brief a memorandum from Paul Butkovich to Tom Patterson dated January 12, 1999 purportedly explaining his reasons for selecting Eric Johnson over Karen Hoffman for the midnight shift foreman's position. Although Butkovich states in that memo that Eric Johnson has "[b]etter technical skills and trouble shooting capabilities per the opinions of current molding department foremen (Cabot, Greene, Smith)," this statement is not supported by the deposition testimony of these foremen. At best, Butkovich's memo and the deposition testimony of the molding department foremen creates an issue of credibility

which cannot be resolved on summary judgment.

18. Plaintiff having presented sufficient evidence of pretext to withstand summary judgment on her *McDonnell Douglas* theory has also presented sufficient evidence to withstand summary judgment on her direct evidence/intentional discrimination theory, as well. *See Terbovitz supra,* and *Blalock, supra,* finding that evidence which supports a finding of pretext under the *McDonnell Douglas* formula also supports a finding that the defendant failed in its burden of proving that the same decision would have been made regard-

## C. *RETALIATION*

Plaintiff has also alleged claims of retaliation for employer actions which occurred after she filed her EEOC charge.

 In order to state a claim of retaliation under the federal civil rights laws, a plaintiff must establish by a preponderance of the evidence:

1. That she engaged in a protected activity;

2. That the defendant knew of this exercise of her protected rights;

3. That the defendant consequently took an employment action adverse to plaintiff; and

4. That there was a causal connection between the protected activity and the adverse employment action.

*Fenton v. HiSAN, Inc.,* 174 F.3d 827, 831–2 (6th Cir.1999); *Moore v. KUKA Welding Systems,* 171 F.3d 1073, 1079 (6th Cir. 1999); *EEOC v. Avery Dennison Corp.,* 104 F.3d 858, 860 (1997); *Canitia v. Yellow Freight System,* 903 F.2d 1064, 1066 (6th Cir.1990), *cert. denied,* 498 U.S. 984, 111 S.Ct. 516, 112 L.Ed.2d 528 (1990). All four elements must be established in order to make out a *prima facie* case. *Fenton, supra,* 174 F.3d at 832.[19]

 Both federal law and Michigan law prohibit retaliatory conduct by an employer in two situations: (1) when an employee has made a charge of discrimination or filed a complaint of discrimination with the EEOC or the Michigan Department of Civil Rights or otherwise participated in enforcement proceedings before one of those agencies ("the participation clause"); or (2) when an employee "has opposed a

violation [of the Act]" (the "opposition clause"). *Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1312 (6th Cir. 1989). As the Sixth Circuit observed in *Booker,* "The distinction between employee activities protected by the participation clause and those protected by the opposition clause is significant because federal courts have generally granted less protection for opposition than for participation in enforcement proceedings." *Id.* By contrast, the courts have found that the participation clause affords "exceptionally broad protection" under the civil rights laws.

Plaintiff here alleges that after filing her EEOC charge, she was denied training which had been offered to her on January 12. Plant Manager Paul Butkovich admitted in his deposition that Plaintiff had not been offered such training. [Butkovich Dep. p. 39. *See also,* Plaintiff's Dep. pp. 213–215.] She also claims that she has been denied overtime work and shift coverage opportunities. While Defendant has presented evidence establishing that overtime has not been required as much as it has in the past, and that Plaintiff has, nonetheless, logged more overtime hours in 1999 than any other first shift assistant foreman [*see* Affidavit of Sebro Office Manager Roxanne Barnes, Defendant's Ex. 4], Defendant has not disputed Plaintiff's deposition testimony that "shift coverage" (i.e., filling in for absent foremen) opportunities have not been offered to her but instead, have been given to newer assistant foremen even though she is the senior or first assistant foreman on first shift. [*See* Plaintiff's Ex. 13.]

less of the discriminatory motivation. *Terbovitz,* 825 F.2d at 115, quoting *Blalock,* at 712.

**19.** A higher standard is required to make out a *prima facie* case of unlawful retaliation under Michigan law. To make out a claim under the Michigan civil rights laws requires that the plaintiff establish (1) that he opposed violations of the Act or participated in activities protected by the Act, and (2) that the opposition or participation was *a significant*

*factor* in the adverse employment decision. *Booker v. Brown and Williamson,* 879 F.2d 1304, 1310 (6th Cir.1989). The *significant factor* standard "requires a showing of more than a 'causal link.' A factor can be a 'cause' without being 'significant.' Only the latter is sufficient to show retaliatory discharge." *Id.,* quoting *Polk v. Yellow Freight System, Inc.,* 801 F.2d 190, 199 (6th Cir.1986).

With respect to the shift coverage issue, it is undisputed that Dave Cabot offered Plaintiff the opportunity to cover for absent foremen in May 1999, but that he told her she would have to (1) change her attitude and (2) stop her complaints. It is further undisputed that Plaintiff, contending that she did not have to change her attitude, and that she "was not going to kiss anybody's ass to get a job," declined the shift coverage offer.

However, when Cabot informed Plant Manager Paul Butkovich that Plaintiff had turned down the shift coverage offer, he directed Cabot to have Plaintiff sign a memo admitting that she had refused a job assignment. [*See* Butkovich Dep. pp. 41–44.] Although Mr. Butkovich treated Plaintiff's refusal as an insubordinate act [*see* Butkovich Dep. p. 40], he admitted that Sebro employees could, without repercussion, job assignments that are not routine duties of their regular job. *Id.* Dave Cabot admitted that, notwithstanding that he had a signed document [Cabot Deposition Ex. 6] indicating that Plaintiff had "refused a job assignment," Plaintiff had merely declined "an offer," which she had the option of doing without repercussion. Cabot Dep. pp. 72–74.

The following day, May 12, 1999, Tom Patterson, Paul Butkovich and Dave Cabot conducted another meeting with Plaintiff to discuss her having declined Cabot's offer to her to cover for absent foremen which Patterson characterized as a meeting to discuss Ms. Hoffman's "refusal of job assignment." [*See* Cabot Deposition Exhibit 6]. At this meeting, Tom Patterson, company president, advised Plaintiff that she had to change her attitude or she would be terminated. *Id. See also,* Butkovich Dep. p. 44; Cabot Dep. p. 70.

Defendant Sebro here disputes only whether Plaintiff has established a sufficient causal nexus between her filing of her EEOC charge and the subsequent adverse actions taken by the company against her.

In order to show a causal connection, a plaintiff must produce sufficient evidence from which an inference can be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action. *Allen v. Michigan Dept. of Corrections,* 165 F.3d 405, 413 (6th Cir. 1999). *See also Zanders v. National R.R. Passenger Corp.,* 898 F.2d 1127 (6th Cir. 1990) (to establish a causal connection, the plaintiff is required to "proffer evidence 'sufficient to raise the inference that her protected activity was the likely reason for the adverse action.' " *Id.* at 1135 (citations omitted)). Although no one factor is dispositive in establishing a causal connection, evidence that the defendant treated the plaintiff differently from identically situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation. *Moore v. KUKA Welding Systems, supra; Allen v. MDOC, supra; Moon v. Transport Drivers, Inc.,* 836 F.2d 226, 230 (6th Cir.1987).

Here, most of the specific adverse actions complained of occurred within one month of Plaintiff's filing of her EEOC charge. This temporal nexus itself is sufficient to raise an inference that the actions complained of were taken in retaliation for filing an EEOC complaint. Furthermore, it is clear that Plaintiff was specifically warned to "change her attitude" and "stop her complaints," statements which, in context, could be construed as threats relating to her complaints of sex discrimination. Therefore, the Court finds in this case that Plaintiff has alleged sufficient facts to make out a *prima facie* claim of retaliation.

The *McDonnell Douglas/Burdine* burden shifting paradigm applicable in disparate treatment discrimination cases is applicable to retaliation claims, as well. *See, Zanders v. National R.R. Passenger Corp., supra,* 898 F.2d at 1134. Defendant here proffers the same evidence to rebut Plaintiff's retaliation claim as it did to rebut Plaintiff's discrimination claim. As

discussed above in this Opinion and Order, the Court finds that Plaintiff has produced sufficient evidence to establish an issue of fact as to whether Defendant's proffered reasons were pretextual.

## CONCLUSION

For all of the foregoing reasons, the Court finds that Defendant is not entitled to entry of summary judgment in this case. Accordingly,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment be, and hereby is, DENIED.